PITTSBURGH PRESS COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Pittsburgh Mailers Union Local
No. 22, Intervenor.

No. 91–1465.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 22, 1992.

Decided Oct. 27, 1992.

John H.M. Fenix, Cleveland, Ohio, with whom Betty Southard Murphy, Washington, D.C., were on the brief, for petitioner.

Vincent J. Falvo, Attorney, N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Supervisory Attorney, N.L.R.B., Washington, D.C., were on the brief, for respondent. Nancy J. Gottfried, Washington, D.C., entered an appearance for respondent.

Richard Rosenblatt, Philadelphia, Pa., for intervenor Pittsburgh Mailers Union Local No. 22.

Before WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Circuit Judge SENTELLE.

WALD, Circuit Judge:

Petitioner Pittsburgh Press Company ("Press") seeks review of a decision and order of the National Labor Relations Board ("NLRB" or "Board") concluding that the Printing, Publishing & Media Workers Sector of Communication Workers of America, Mailers Union, Local No. 22, AFL–CIO ("Union") did not commit an unfair labor practice in violation of subsection 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) ("NLRA" or "Act"), by charging part-time mailroom employees a $2–per–shift fee for being called by the Union to report for work on a particular shift. Overruling the decision of the Administrative Law Judge ("ALJ"), the Board found that this practice constituted a valid referral system for which the Union was entitled to collect a reasonable fee.

We are unpersuaded that this arrangement conforms to the Board's prior definition of a valid referral system for which the Union may collect a fee, or that the Board has adequately articulated and justified a new definition to cover this case. As a result, we are unable to conclude that the Board's interpretation of the Act as permitting the referral fee under the circumstances of this case is a reasonable one. Consequently we remand to the Board for reconsideration and a more adequate explanation of its ultimate decision.

## I. BACKGROUND

### A. *Facts*

The facts in this case are simple and undisputed. The Union represents a unit of mailroom employees at Pittsburgh Press's North Side plant. In 1987, the Press closed one of its buildings, citing safety considerations, and laid off fifty-seven employees who worked in that building. The Union filed a grievance on their behalf. In February 1988, the parties signed a Memorandum of Understanding ("Memorandum") to settle this grievance. In this Memorandum, the Press agreed to reopen the plant in exchange for certain concessions from the Union. To realize the Press's intention to minimize overtime, the Memorandum gave the Press the right to create a new class of part-time or temporary employees who would replace overtime shifts by regular employees. These part-timers were expressly excluded from the parties' collective bargaining agreement.

Part-timers are hired under the same procedures as other Press employees: The Press screens and interviews prospective employees and requires them to fill out an application and undergo a physical examination. Candidates who satisfy the Press's requirements are placed on the part-timer call-in list. The Union participates in this process by nominating persons to be screened and interviewed by the Press. Although the Press is free to reject any individual Union nominee, half of the part-timers on the list must have been referred by the Union.

The Memorandum charged the Press with compiling, and the Union with maintaining, the list of part-timers. In practice, however, the Press both compiles and maintains the list, printing an updated one

each week. The Memorandum provided that the Union would "call in to work such number of part-timers on a rotation basis from the list as may be required by the [Press]." Every day except Sunday the company's representative (the mailing room superintendent) gives the Union's elected representative the call-in list for the week and a list of the shifts for which the Press needs workers. When no elected Union representative is available, the mailing room superintendent gives the list to a mailroom employee. The caller goes through the list, top to bottom, calling and scheduling workers until the shifts are filled. Each caller starts where the last one left off. The calls are made from the company's premises, using the company's phones, and the callers are all company employees who are paid their regular wages for the time they spend calling. Although fees are not mentioned in the Memorandum, the Union charges part-timers $2 for each shift worked. The Memorandum gives the company the right to terminate the call-in system if the Union abuses it.

### B. *Procedural History*

On December 14, 1989, the General Counsel of the NLRB issued a complaint charging that the Union's collection of a "referral" fee from part-timers constituted an unfair labor practice in violation of section 8(b)(1)(A) of the National Labor Relations Act.[1] On May 17, 1990, the case was tried before an ALJ. On January 11, 1991, the ALJ issued his decision and order, in which he concluded that the Union was not providing a job referral service to the part-timers, and therefore was not entitled to charge them a job referral fee, because the part-timers "did not gain employment through [the Union's] efforts." The ALJ determined instead that the "call-in list results exclusively from the [Press's] efforts.

The [Union] does not assist in the process.... Instead it acts as a conduit in the process of scheduling part-timers for work in the [Press's] mailroom." By collecting a fee, concluded the ALJ, the Union had coerced the part-timers in the exercise of their right to refrain from assisting a labor organization, in violation of sections 7 and 8(b)(1)(A) of the NLRA.

The Union excepted to the ALJ's decision and sought review by the NLRB. On August 27, 1991, a three-member panel of the Board, with Member Oviatt dissenting, reversed the ALJ's decision. The Board found that, contrary to the ALJ's conclusions, the Union was operating a valid referral system for which it was entitled to charge a fee. The Press petitioned for review of the Board's order pursuant to section 10(f) of the Act, 29 U.S.C. § 160(f) (1988).

### C. *Standard of Review*

Under well-established principles of deference, we must uphold the Board's determination unless it has "acted arbitrarily or otherwise erred in applying established law to the facts at issue." *North Bay Dev't Disabilities Servs. v. NLRB*, 905 F.2d 476, 478 (D.C.Cir.1990) (citing *United Food & Commercial Workers Int'l Union, Local 150–A v. NLRB*, 880 F.2d 1422, 1428–29 (D.C.Cir.1989)). We thus affirm a decision of the Board decision if it is "reasonably defensible." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495–97, 99 S.Ct. 1842, 1848–49, 60 L.Ed.2d 420 (1979). Here, the Board's decision interprets the NLRA, a statute it administers, and addresses a specific issue—the threshold requirements of a compensable referral system justifying a union's collection of a fee from nonunion users—on which Congress has not made a clear statement. The Board's determina-

---

**1.** Section 8 provides, in relevant part:
  It shall be an unfair labor practice for a labor organization or its agents (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed under [section 7].
  29 U.S.C. § 158(b)(1)(A) (1988). Section 7 of the Act says employees have
    the right to self-organization, to form, join, or assist labor organizations, to bargain collec-

tively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and ... the right to refrain from any or all of such activities.
  *Id.* § 157.

tion is, therefore, accorded particular weight. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

█ The Board, like any other agency, however, has a corresponding duty to give a reasoned justification for any departure from its prior policies or practices, *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983), and to present its decision "in such form as to enable this court to pass intelligently on that decision, and to determine whether it is rationally related to findings and supported by substantial evidence." *Oil, Chem. & Atomic Workers Int'l Union v. NLRB,* 362 F.2d 943, 946 (D.C.Cir.1966) (citing *Retail Store Employees Union v. NLRB,* 360 F.2d 494 (D.C.Cir.1965)).

## II. DISCUSSION

█ Section 8(b)(1)(A) of the NLRA makes it an unfair labor practice for a union to restrain or coerce an employee in the exercise of his or her rights protected by the Act, including the right to refrain from assisting a labor union. Where, as here, the union exacts a fee from a nonunion worker, the question is whether the union is collecting the fee to cover the reasonable cost of providing a meaningful service to the worker or is, instead, coercing the nonunion worker to contribute to the union's coffers, without providing a relevant service to the worker. The former is permitted; the latter can constitute an unfair labor practice. *See, e.g., Highway & Local Motor Freight Employees, Local 667 v. NLRB,* 248 N.L.R.B. 260 (1980), enf'd, 654 F.2d 254 (6th Cir.1981) (*Spector Freight* ).

The operation of a "hiring hall" or job referral system is one of the services for which a union may collect a reasonable fee from nonunion workers. *Highway & Local Motor Freight Employees, Local 667 v. NLRB,* 248 N.L.R.B. 260 (1980), enf'd, 654 F.2d 254 (6th Cir.1981) *(Spector Freight); NLRB v. Operating Engineers Local 138 (Hagerty Co.),* 385 F.2d 874, 877 (2d Cir.

1967). The Board determined here that the Union operated a valid hiring hall that justified the collection of the $2–a–shift fee. In our review of that determination, and in view of the fact that the text of the Act by itself provides no answer to the legitimacy of the practice we are concerned with, we consider first the legislative history of section 8(b)(1), then the case law governing hiring halls.

### A. *Unfair Labor Practices by Unions*

Together, sections 7 and 8 of the NLRA protect individual employees against union abuses. The current version of these provisions became law in 1947 as part of the Labor–Management Relations Act of 1947, Pub.L. No. 101, 61 Stat. 136 (1947), 29 U.S.C. § 141–187 (1988), also known as the Taft–Hartley Act. Until 1947, Congress had taken a *laissez-faire* approach to the conduct of labor unions, imposing "numerous restraints upon management, but none whatsoever upon labor organizations." Gerard D. Reilly, *The Legislative History of the Taft–Hartley Act,* 29 GEO. WASH.L.REV. 285, 285 (1960). The Taft–Hartley Act was intended to correct this imbalance by subjecting union practices to legislative restraints and NLRB oversight. *See* ARCHIBALD COX & DEREK BOK, LABOR LAW CASES & MATERIALS 133 (6th ed. 1965); *see generally* 1 ABA SEC. LAB. & EMPLOYMENT, THE DEVELOPING LABOR LAW 35–48 (Charles Morris ed., BNA Books 1983). It reflected the congressional policy "to protect the rights of individual employees in their relations with labor organizations...." Short Title and Declaration of Policy, Labor–Management Relations Act of 1947, Pub.L. No. 101, 80th Cong., 1st Sess., *codified at* 29 U.S.C. § 141.

It was to achieve this goal of employee freedom from union coercion that Congress added the two provisions at issue here. First, it amended section 7, which defines individual employees' rights, to protect the workers' right to *refrain* from engaging in union activities. Second, Congress added section 8, which provides that unions, as well as employers, can commit unfair labor practices, and defines as one of those prac-

tices the interference with the rights of an individual worker, which under section 7, includes the right to refrain from assisting a labor union.

## B. *Hiring Halls*

Hiring halls, long a familiar site on the labor landscape, are not mentioned in the NLRA. Although both the NLRA and the Taft–Hartley Act dealt with unfair labor practices, neither discussed hiring halls. Early on, however, the Senate committee that had discussed and approved the Taft–Hartley Act endorsed hiring halls as consistent with the Act, and the Supreme Court and the NLRB soon thereafter affirmed the legitimacy of traditional union hiring halls. A brief look at the characteristics of the hiring hall when it first achieved legitimacy will help us—and the Board—determine whether its modern-day successor retains enough of the original features that were used to justify the imposition on non-union workers of arrangements negotiated between the union and the employer.

### 1. The Original Hiring Hall

Hiring halls first gained prevalence in the maritime and building and construction industries, and it was in the maritime context that Congress addressed this issue. Following several decisions declaring certain hiring hall practices in violation of the NLRA, *see, e.g., NLRB v. National Maritime Union of America,* 175 F.2d 686 (2d Cir.1949), the Subcommittee on Labor–Management Relations of the Senate Committee on Labor and Public Welfare conducted an investigation and issued a report on maritime hiring practices. S.Rep. No. 1827, 81st Cong., 2d Sess. (1950). The report defended maritime hiring halls, noting their strong tradition and broad acceptance, *id.* at 3–4, and concluding that they benefited employers, employees and society as a whole by reducing wasted manpower, inefficiency, corruption, favoritism, and the petty crime that accompanies unemployment, *id.* at 7–11. This endorsement of the hiring halls was motivated in part by concern for the maritime workers: without hiring halls, they were "at the mercy of petty racketeers who demanded kick-backs," lacking in "dignity and stability," and vulnerable to "bad housing and health conditions." *Id.* at 6. Senator Taft, a principal author of the Taft–Hartley Act, proclaimed: "In order to make clear the real intention of Congress, it should be clearly stated that the hiring hall is not necessarily illegal. The employer should be able to make a contract with the union as an employment agency. The union frequently is the best employment agency." *Id.* at 13 (additional views of Sen. Taft).

Eight years later, the NLRB reaffirmed the legitimate function of hiring halls as employment agencies, particularly in fields "characterized by short-term hirings of individual work[ers] who form a general pool of employees serving a large number of separate employers...." *Mountain Pacific Chapter of Assoc. Gen'l Contr. v. NLRB,* 119 N.L.R.B. 883, 894 n. 2 (1958), *enf. denied in part,* 306 F.2d 34 (9th Cir. 1962), *overruled in part, International Bhd. of Teamsters, Local 357 v. NLRB,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961). The Board thus endorsed the hiring hall as a means "to eliminate wasteful, time-consuming and repetitive scouting for jobs by individual work[ers] and haphazard uneconomical searches by employers." *Id.* at 896 n. 8. At the same time, the Board demonstrated its concern about the potential abuse of hiring hall arrangements, ruling that no hiring hall agreement between a union and an employer was valid unless it included certain safeguards. *Id.* at 897 (agreement must include the guarantee of nondiscriminatory treatment of nonunion members; the retention of the employer's right to reject any applicant referred by the union; and public posting of the hiring hall agreement and its safeguards).

Three years later, the Supreme Court relied on both the Senate Report and *Mountain Pacific* to hold that hiring halls were not *per se* illegal. *International Bhd. of Teamsters, Local 357 v. NLRB,* 365 U.S. 667, 674–76, 81 S.Ct. 835, 839–40, 6 L.Ed.2d 11 (1961) (quoting Senator Taft's language); *id.* at 672, 81 S.Ct. at 838 (citing

Senate Report and suggesting that Congress found hiring halls useful "particularly in the maritime field and in the building and construction industry") (citation omitted). Although the Court overruled the Board's requirement that each hiring hall agreement include the three protective provisions, *id.* at 676, 81 S.Ct. at 840, it confirmed that coercive practices in the operation of a hiring hall could amount to unfair labor practices. *Id.* at 674–75, 81 S.Ct. at 839. The Board ruled soon thereafter that one such practice outlawed by the Act was a union's charging nonunion employees a referral fee that exceeded their pro rata share of the cost of running a hiring hall. *See Operating Engineers Local 825 (Homan Co.),* 137 N.L.R.B. 1043 (1962); *NLRB v. Operating Engineers Local 138 (Hagerty Co.),* 385 F.2d 874, 877 (2d Cir. 1967); *Spector Freight, supra.*

Congress, the Supreme Court and the NLRB thus agreed on the basic principles of a legitimate hiring hall for which nonunion workers could be charged a fee by the union: It functioned as an employment agency or job referral service; it was designed to benefit employees as well as employers; and it had to be operated in a manner that did not coerce nonunion workers in violation of their rights.

### 2. The Modern–Day Referral System

The three decades since the Supreme Court decided *Local 357* have brought about significant changes in hiring halls. The original paradigmatic hiring hall involved an actual hall or facility from which the union operated a full-fledged employment agency, screening prospective workers, building and maintaining lists of eligible workers, and dispatching those workers in response to employer requests. Today's hiring hall, more accurately described as a "referral system," generally requires substantially less union effort and involvement. The union and the employer may collaborate in screening workers, compiling and maintaining lists, contacting workers, or selecting certain workers for certain shifts, and the union's participation may occur not at its own hall, but on the employer's premises. The Board has, nonetheless, recognized a variety of such arrangements as valid referral systems, justifying a fee charged by the union to nonunion employees who use it. *See, e.g., Toledo World Terminals,* 289 N.L.R.B. 670, 671–73 (1988) (union operated a compensable referral system when the union steward, on the employer's premises, called out the names of that day's workers from a union/company list); *Plumbers Local 17,* 224 N.L.R.B. 1262 (1976), *enf'd,* 575 F.2d 585 (6th Cir.1978) (union could charge a fee for maintaining a list of available workers, which it read to employers over the phone); *Detroit Mailers Union No. 40,* 192 N.L.R.B. 951 (1971) (referral system justifying a fee when company identified and hired some employees prior to their union referral). Although the precise criteria for a valid referral system remain elusive, the Board has held that a union does not operate a valid referral system and therefore may not collect fees where employees " 'd[o] not gain employment through the referral system of, or through any effort extended by, [the union].' " *See Spector Freight,* 248 N.L.R.B. at 262 (quoting *Detroit Mailers,* 192 N.L.R.B. at 962).

### C. Application of the Law to this Case

██ Through the years, as the unions' hiring hall "efforts" have dwindled, the Board has shown little inclination to inquire whether a particular union's involvement justifies the title "referral system" and warrants the collection of a fee. Indeed, in this case, the Board expressly declined to "pass on the magnitude of the Union's efforts," stating that the "reasonableness" of the $2–a–shift fee was not at issue. We believe the Board erred when it gave no consideration either to the magnitude of the Union's efforts, or to the stage in the employment process at which these efforts occurred, why they were undertaken, what they produced, or who benefited from them—in short, whether they were sufficiently meaningful to justify exacting any fee at all from the part-timers.

Indeed, the cryptic quality of the Board's opinion suggests to us that the Board slid too quickly past two critical aspects of its

statutory obligation: first, it failed to follow or at least rationalize its own precedents or, alternatively, to explain its departure therefrom; and second, in the absence of any such explanation, it may have rendered an unreasonable interpretation of the NLRA's provisions designed to protect individual workers from union coercion.

### 1. The Board's Precedents

In ruling that the Union did not operate a valid referral system, the ALJ relied on two Board precedents, *Detroit Mailers* and *Spector Freight*. Since these cases provide some guidance into the otherwise elusive definition of a valid referral system, they warrant discussion here.

In *Detroit Mailers*, the parties negotiated a collective bargaining agreement under which the union was to operate an exclusive referral system for casual employees. To develop the list of casual employees, the two employers, the Detroit News and the Detroit Free Press, gave the union, Detroit Mailers No. 40, lists of employees who had worked for them. The union culled through these lists, striking the names of regular and journeymen employees, and using the remaining names, who were casual employees, as the nucleus of the list for its referral system. The union then set ten of its members to work, at its offices, calling the remaining names to ask them to come to the union's office to fill out applications for casual employment. When it became apparent that the list was inadequate, the union supplemented it. The union prepared the employment application and created and ran the referral system. A salaried union employee devoted about 27 hours a week to running the referral system, and the union's president handled the rest of the responsibilities. The union charged nonunion employees a referral fee of $1.50 per shift.[2]

There was no dispute over whether this constituted a valid referral system. Both parties, the General Counsel, the Trial Examiner, and the Board all agreed that it was. Instead, *Detroit Mailers* involved, among other charges, a claim that the union charged referral fees from workers who obtained employment directly through the company, neither seeking nor obtaining a referral from the union. Specifically, the complaint alleged that the union "ha[d] charged and collected a daily referral fee as a condition of employment from newly hired mailroom employees who did not gain employment through the referral system of, or through any efforts extended by, [the union]." *Id.* at 962. The Trial Examiner ruled, and the Board agreed, that this constituted an unfair labor practice.

*Spector Freight*, by contrast, was a direct challenge to whether a legitimate hiring hall existed. The collective bargaining agreement between the union, Teamsters Local 667, and the employers, Memphis area trucking companies, provided for the operation of an exclusive hiring hall. A union employee maintained two lists at the union's referral hall. The first list was of casual employees who worked regularly for a specific employer. Once an employee's name was put on this list, the employers contacted him or her directly. The second or "miscellaneous list," limited to fifty names, was made up of workers who were not regularly employed by a particular employer. If an employer could not fill its requirements through the first list, it called the referral hall for additional casual employees from the miscellaneous list. Employers rarely called for workers from this second list, and ultimately, the union simply sent the list directly to each signatory employer. From that point on, the employers contacted all employees directly. The union charged nonunion casual employees a monthly referral fee which started at $15, then rose to $17.

---

**2.** The Trial Examiner upheld this fee as reasonable, based on the union's cost of at least $10,-000 a year to operate the system. *Detroit Mailers*, 192 N.L.R.B. at 962. The Board adopted this ruling. *Id.* at 951.

Although the case before us does not directly challenge the reasonableness of the $2–a–shift

fee, we nonetheless find this case instructive. As we discuss *infra* at 660, we believe that whether a union incurred any expense in operating a referral system is relevant to whether it can charge any fee.

The ALJ ruled that the union operated a valid referral system, but that it charged excessive referral fees. The Board disagreed, concluding that the union "did not conduct even the semblance of a bona fide hiring hall." *Id.* at 261–62. Adopting the language from the complaint in *Detroit Mailer*, the Board concluded: "Where, as here, [the union] charges and collects a fee from employees 'who did not gain employment through the referral system of, or through any effort extended by, [the union],' we cannot consider *any* payments made thereby to be lawful under the Act." *Id.* at 262 (quoting *Detroit Mailers*, 192 N.L.R.B. at 952).

Turning to the case before us, the ALJ below read the Board's "gaining employment" language as incorporating a requirement of a hiring hall arrangement in which the Union played a part in the actual hiring of the employee. He concluded that the part-timers, like the complaining workers in *Detroit Mailers*, "gained employment at the [Press] without any effort by the [Union]." Inherent in his ruling was an interpretation of "gaining employment" as encompassing the act of being hired by the Press and put on the call-in list, not merely being called to report for a designated shift.

We agree with the ALJ that this "gaining employment" language is the Board's clearest statement to date on the *sine qua non* of a compensable referral system. Looking back through the Board's decisions, however, we cannot say that it has consistently and clearly applied any such test, certainly not as the ALJ interpreted it, nor so far as we can discern, in any other reasonable way. If the Board does indeed look to union efforts through which workers gain employment as the hallmark of a legitimate referral system, we would assume it looks for some meaningful effort on the part of the union to justify requiring a nonunion employee to pay money to a union. The Board has not, however, provided us with any benchmark as to how the union's role or efforts in any joint referral arrangement are to be evaluated, either as to nature or magnitude. Moreover, since *Detroit Mailers* and *Spector Freight* in-

volved allegations that the union did absolutely nothing for and had no contact with the employees from which it collected a fee, or as the Board put it, "washed its hands of the referral process," those oft-cited cases tell us virtually nothing about where the Board draws the line on the continuum between a full-fledged hiring hall and a sham operation like the one in *Spector Freight*.

Since we don't know precisely where the Board thinks that line should be drawn, we cannot say with authority whether the arrangement here has crossed it. We can, and do, urge the Board on remand to explain some fundamental issues raised by, but not answered in, its initial effort. First, in its decision below, the Board said the "decisive factor" in finding that the Union/Press call-in arrangement constituted a valid referral system was that "a person available for work and an employer with work to be performed are brought together through the services of the Union." This seems to depart or at least represent a shift in focus from any requirement that the workers "gain employment" through the efforts of the Union. If the Board is really saying that the Union's performance of *any* "service"—no matter how minute or ministerial—incident to someone's working a shift is enough to qualify as a referral system and justify the assessment of a fee, we believe it represents a shift in the Board's policy that requires further explanation.

Second, the Board's decision, taken at face value, suggests that the Union is entitled to charge nonunion employees anytime they are "routed" through the Union. The Board observed that "the Company and the Union ha[d] agreed that the Company [would] 'route' its requirements for part-time/temporary employees through the Union," and noted that the Board had approved other "routing" arrangements as valid referral systems. *Id.* Merely requiring that employees be "routed" through the union, however, seems to fall short of requiring that they have "gained employment" through the union. Here, for instance, the ALJ and the dissenting member

of the Board characterized the Union's "services" as acting merely as "a conduit in the process of scheduling part-timers for work in the Company's mailroom." If the Board contends that phoning employees who have already been hired by the company and scheduling their shifts is a service through which they gain employment, the Board needs to explain more fully how this constitutes referring workers for employment, as opposed to merely calling employees to work. If the Board is, in fact, jettisoning any "gaining employment" requirement, to the extent that it no longer requires that the union exercise any discretion or contribute any effort to the actual "hiring" of an employee, the Board must, at the very least, make this intention clear and give a reasoned justification for its change in policy. It has not done so.

Finally, the Board's seemingly *laissez faire* approach to defining a legitimate referral system is also at odds with its more probing inquiry into the reasonableness of referral fees. On the one hand, the Board seems to be saying that any union effort, however minimal, signals the existence of a hiring hall and validates the collection of some fee. On the other hand, the Board makes clear that no referral fee is reasonable unless it reflects the union's actual expenses in operating the referral system. *See Spector Freight*, 248 N.L.R.B. at 269 (referral fee cannot be "in excess of *cost attributable to the services rendered....*") (emphasis added). This case illustrates how those two policies can collide: Where the imposition of the fee is attacked, rather than its amount, the Board refuses to look at the dimensions of the union's efforts in performing the service, even though that is a clearly relevant factor in determining whether the union is in fact performing any service for which it is entitled to collect any fee.

We recognize that features of the Union/Press call-in system have been present in other arrangements that the Board has heretofore found valid. It has said that a union does not have to locate and screen every worker to be operating a valid referral system. *See, e.g., Detroit Mailers, supra.* In some instances, the union can provide a referral slip after an employer has selected a worker for employment. *See, e.g., Morrison–Knudsen Co.*, 291 N.L.R.B. 250, 258 (1988). The union can fulfill its role on the employer's jobsite, rather than in its own hall. *See, e.g., Toledo World Terminals*, 289 N.L.R.B. 670 (1988). The union need not (and in some instances may not) exercise discretion over which workers it calls or in what order. *See, e.g., Toledo World Terminals, supra.*[3] We have yet to see a case, however, in which the union neither exercised discretion and control over who was hired or for what shift, nor contributed any of its own resources, at its own expense,[4] to the actual referral process. Here, the Union's phoning function, which was largely ministerial, could easily be—and on occasion was—performed by any Press employee, with no supporting resources from the Union. *Cf.* Harry R. Rains, *Construction Trades Hiring Halls*, 10 LABOR L.J. 363, 367 (1959) (one value of hiring halls was union dispatcher's knowledge of workforce and resulting ability to match workers' skills to employers' needs).

We do not think it enough to say that this latest decision is consistent with the general drift of NLRB precedent, as it is that very drift that troubles us. As the union's efforts and services have dwindled, the Board has seemed willing merely to go with the flow, offering no reasoned justifi-

---

**3.** We note here that these cases did not call upon the Board to address squarely the elements of a valid referral system. Like most hiring hall challenges brought to the Board, these were based on the union's operation of the hiring hall in an allegedly unfair manner or its alleged failure to abide by the negotiated terms of agreement creating the referral system. As a result, the Board has rarely focused on the basic criteria for a compensable referral system.

**4.** The ALJ excluded evidence of the costs or lack of costs to the union. The General Counsel's offer of proof would have established that the Union's participation in the call-in system took place entirely at Press expense. On remand, the Board might be able to cite additional findings that reveal that the Union did, in fact, expend some its own resources in the call-in system.

cation for its course, instead of charting, and explaining, a clear course for how or where to draw the line between a union's meaningful, compensable hiring hall efforts and the nonexistent union "efforts" of *Detroit Mailers* and *Spector Freight.*

### 2. The Board's Interpretation of the NLRA

At least on the present record, we cannot say that the Board's position qualifies as a reasonable interpretation of the NLRA. We return to the basics. Sections 7 and 8 of the Act, designed to protect nonunion employees from coercive union tactics, plainly prohibit a union's collection of a fee solely as a condition of employment. Instead, Congress recognized the union's right to collect such a fee only as compensation for performing certain essential hiring functions—functions that constituted a genuine service to both the employee and the employer. Through a collective bargaining agreement, an employer and a union may negotiate for the union to assume some of the employer's hiring responsibilities and authority. If the union devotes resources to this function, in exchange for those resources, it is entitled to charge nonmembers a reasonable fee. There is no rigid formula for a modern-day hiring hall; in each case, the union's particular contribution will vary according to the parties' needs and their negotiated agreement. A union may, for instance, employ its facilities, its phone lines, its network for identifying and recruiting workers, its judgment and expertise in matching a worker's skills with a particular job, or its members' time and effort in building and maintaining a job referral system.

The flexibility of hiring hall arrangements and the parties' broad discretion to negotiate them are not without limits, however. As we see it, however the arrangement is structured, the employer must re-

linquish and the union must assume some necessary hiring function, one that provides an employment service to the employee. Otherwise the "hiring hall" is a sham. The Board has not adequately explained how, on the present record, any hiring authority or responsibilities were in fact transferred from the employer to the union. From what we can tell, the employer screens and interviews all applicants, compiles and maintains the call-in list, provides the location and the phones for calling, and pays the salaries of the callers,[5] all of whom are company employees and some of whom are not even union members. What has the employer relinquished and what has it gained from this arrangement? At the same time, what actual function has the union assumed? What service does it provide through the commitment of union resources? It does not maintain a physical hiring hall, nor does it provide the phones or the computer and administrative support for compiling and updating the list. Although the caller of choice is a Union representative, his efforts come at the expense of the Press, not the Union. Finally, the Union is not required nor yet permitted to exercise any judgment or discretion about which worker to match with which shift. Nonetheless, according to the Board, the Union is entitled to collect $2 per shift from each (nonunion) part-timer. This strikes us as skirting dangerously close to the kind of setup Congress sought to proscribe through section 8(b) of the NLRA. In situations presenting such a potential for abuse, the Board cannot default on its duty to review the fairness of the challenged practice.

We do not now decide whether any reasonable interpretation of the statute would support the conclusion that the Union in this case did not commit an unfair labor practice, as we think the Board should have another go at it. Since certain evidence on

---

**5.** On the question of the employer's payment of the callers' salaries, the Board points out, correctly, that union activities conducted on company time and on the company payroll can still be lawful union activities. *See BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers,* 791 F.2d 1046, 1047, 1051–54 (2d Cir.1986); *NLRB v.*

*Northeastern Univ.,* 601 F.2d 1208, 1214 (1st Cir.1979). We remind the Board, however, that that is a separate issue from whether the union can charge workers a fee to cover costs (such as time, telephones, and overhead) that are, in fact, paid by the company.

the Union's efforts was excluded by the ALJ as going to the reasonableness of the fee, rather than its validity at all, *see supra* note 4, it is always possible that the Board might be able to cite additional findings about Union involvement in the referral system. We do, however, encourage the Board to make explicit its criteria for finding a valid referral system for which non-union workers can legitimately be charged, and to explain, if it so rules, how the Union/Press arrangement meets these criteria.

### III. Conclusion

We are mindful of the deference we owe the Board's expertise and judgment, *see Hammontree v. NLRB*, 925 F.2d 1486, 1491 (D.C.Cir.1991) (*en banc*), particularly where, as here, the Board is interpreting a statute it administers, and it is doing so in the absence of a clear statement from Congress. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). But even giving the Board's decision the deference it is due in these circumstances, we cannot say, on the strength of the Board's decision now before us, that it exercised its discretion rationally and consistently with prior law, or that the Board's interpretation of the Act was reasonably defensible. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495–97, 99 S.Ct. 1842, 1848–49, 60 L.Ed.2d 420 (1979). As we attempt to glean the Board's reasoning from its decision, we are reminded of Justice Holmes' observation that the reasoning of an administrative body may express "an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions ... which may lie beneath consciousness without losing their worth." *Chicago B. & Q. Ry. Co. v. Babcock*, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636 (1907). Nonetheless, we cannot defer to what we imagine the agency had in mind, *National R.R. Passenger Corp. v. Boston & Maine*, — U.S. ——, 112 S.Ct. 1394, 1407, 118 L.Ed.2d 52 (1992) (White, J., dissenting), so we remand to the Board for reconsideration and a reasoned justification for its decision.

■ We emphasize, however, that we are not issuing a call for a return to days gone by or a reinstitution of the hiring hall of the 1950s. Times have changed, and so have hiring practices. The governing principles of the NLRA, however, have not: A union commits an unfair labor practice when it charges nonunion workers a referral fee in excess of the costs of the services they receive from the union, services that, under the Board's own precedents, must have helped the workers gain employment. As labor practices change, and referral systems evolve, the Board's duty is to monitor them and to ensure that, at a minimum, any union that collects a referral fee from a worker have performed some meaningful employment service for the benefit of that worker. The evolution of practices does not excuse the erosion of statutory standards.

So ordered.

SENTELLE, Circuit Judge, concurring:

I agree with the majority that the Board has erred and that we must remand. I differ from my colleagues in the breadth of the Board's authority upon remand.

As the majority makes plain, the precedents of the Board and the courts establish that a union which charges non-union workers must have done something to earn the charge—performed some service or provided some assistance through which the employees "gained employment"—or be in violation of § 8 of the Act, 29 U.S.C. § 158(b)(1)(A) (1988). *See Highway and Local Motor Freight Employees, Local Union No. 667*, 248 N.L.R.B. 260 (1980) (*Spector Freight System, Inc.*); *Detroit Mailers Union No. 40, Int'l Typographical Union*, 192 N.L.R.B. 951 (1971); *see also NLRB v. Local 138, Int'l Union of Operating Eng'rs*, 385 F.2d 874, 877 (2d Cir.1967), *cert. denied*, 391 U.S. 904, 88 S.Ct. 1653, 20 L.Ed.2d 418 (1968).

I find quite instructive an old case from the Second Circuit wherein that Circuit tied the union's right to exact a fee from non-union members hired under a hiring-hall arrangement to the expense of the local in

operating the hall. *Local 138, Int'l Union of Operating Eng'rs v. NLRB*, 321 F.2d 130, 135 (2d Cir.1963). As that court expressed it, "While a union might under proper accounting procedures include in the cost of operating a hiring hall some reasonable percentage of the union's general expenses, the union has not argued before us that its charges to nonmembers were based on anything except an intention to exact from them the amount paid by members." *Id.* at 135.

In the present case the parties had ample chance to make an evidentiary record before the ALJ and to argue the same before the Board. It appears here that the union is charging the one-half of the call-in list not nominated by the union a fee for doing *absolutely nothing.* The union incurred no expense. The personnel making the calls were on company time. Those personnel may have been union members, but that was incidental to what they were doing. Granted, the ALJ excluded some evidence, but as the court's opinion makes clear, that evidence did not help the union, but rather hurt it. *See* Maj. Op. at 660 n. 4.

Thus, while I concur with the majority's reasoning, and its result, so far as it goes, I would remand for a result that goes a bit further. Rather than remand for reconsideration and reasoned justification of the decision, I would remand with instructions that the Board affirm the finding of the ALJ that the union has committed an unfair labor practice, and enter a remedial order.