United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 7, 1998 Decided June 26, 1998 

 No. 97-1401

 Bufco Corporation, et al., 

 Petitioners

 v.

 National Labor Relations Board, 

 Respondent

 International Brotherhood of Electrical Workers, 

 AFL-CIO, Local 16, 

 Intervenor

On Petition for Review and Cross-Application for 
Enforcement of an Order of the National 
Labor Relations Board

 Maurice Baskin argued the cause for petitioners. With 
him on the briefs was John C. Hardwick, Jr.


 Robert J. Englehart, Attorney, National Labor Relations 
Board, argued the cause for respondent. With him on the 
brief were Linda Sher, Associate General Counsel, Aileen A. 
Armstrong, Deputy Associate General Counsel, and Margaret 
A. Gaines, Supervisory Attorney. Frederick Havard, Super-
visory Attorney, entered an appearance.

 Charles L. Berger argued the cause and filed the brief for 
intervenor International Brotherhood of Electrical Workers, 
AFL-CIO, Local 16.

 Before: Wald, Ginsburg, and Randolph, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: This is a petition for review of a 
supplemental decision and order of the National Labor Rela-
tions Board affirming an Administrative Law Judge's calcula-
tion of the amount of a back pay award. The Board has filed 
a cross-application for enforcement of its order. We sustain 
the Board's refusal to toll interest on the award, and uphold 
the Board's hiring hall remedy and its decision to pierce the 
corporate veil. We reject the Board's determination that four 
disputed employees performed bargaining unit work, and 
thus were entitled to back pay, and we vacate and remand the 
Board's approval of a back pay award calculated on a weekly 
basis.

 I

 Corbett Electric Company, Inc., and Bufco Corporation are 
Indiana corporations closely held by the Corbett family.1 For 
more than thirty years, Corbett Electric operated as an 
electrical contractor in the construction industry. As a mem-
ber of the National Electrical Contractors Association 
("NECA"), it entered into two multiemployer collective bar-
gaining agreements recognizing Local 16, International 

__________
 1 Bill Corbett is the sole owner of Corbett Electrical. Initially he 
was also the sole owner of Bufco, but on August 1, 1982, he 
transferred 49 shares of Bufco to his wife Lucinda and the remain-
ing 51 shares to his son Mark.


Brotherhood of Electrical Workers as the exclusive bargain-
ing representative for its employees in its residential and 
commercial electrical units.2 Bufco was incorporated in 1970 
and began engaging in construction work on single-family and 
multifamily housing projects. In 1977, Bufco ceased its con-
struction work and lay dormant for a number of years 
thereafter.

 In the summer of 1982, Corbett Electric terminated its 
membership in NECA and informed the Union that it was 
repudiating both the residential and commercial bargaining 
agreements. On December 9, 1982, the Union filed unfair 
labor practice charges with the Board against Corbett Elec-
tric. Shortly thereafter, the Corbetts resurrected Bufco and 
it began performing electrical contracting work. In response, 
the Union filed charges against Bufco.

 The Board found that Bufco was the alter ego of Corbett 
Electric and that both companies had violated Sections 8(a)(5) 
and (8)(a)(1) of the National Labor Relations Act, 29 U.S.C. 
ss 158(a)(5) and 158(a)(1), by repudiating the collective bar-
gaining agreements and by transferring electrical work from 
Corbett Electric to Bufco in order to avoid contractual obli-
gations. See Bufco Corp., 291 N.L.R.B. 1015 (1988). The 
companies had withdrawn recognition of the Union, discontin-
ued contractually required payments to benefit plans on 
behalf of employees, and changed employees' contractually 
specified wage rates. As part of its remedy, the Board 
ordered Corbett Electric and Bufco to "make whole ... 
employees for any loses they may have suffered." 291 
N.L.R.B. at 1017. The Seventh Circuit enforced the Board's 

__________
 2 The collective bargaining agreements were pre-hire agree-
ments negotiated under s 8(f) of the National Labor Relations Act, 
29 U.S.C. s 158(f). Section 8(f) "allows employers in the building 
and construction industry to bargain with a union without an initial 
election or showing of majority support." Bentson Contracting Co. 
v. NLRB, 941 F.2d 1262, 1263 (D.C. Cir. 1991). Both agreements 
provided that the Union was to be "the sole and exclusive source of 
referral of applicants for employment."


decision and order in full. See NLRB v. Bufco Corp., 899 
F.2d 608 (7th Cir. 1990) ("Bufco I").

 A back pay specification to remedy the effects of Corbett 
Electric/Bufco's unfair labor practices resulted in hearings 
before another ALJ, who recommended piercing the corpo-
rate veil in order to hold liable individual members of the 
Corbett family. The Board affirmed and entered an award of 
$136,556 plus interest against Bill, Lucinda, and Mark Cor-
bett, Bufco Corporation, Corbett Electric Company, and Mar 
Beck, Inc., a third corporation owned by the Corbetts--all of 
whom are petitioners. See 323 N.L.R.B. No. 104 (1997).

 II

 One of Bufco's complaints is that the Board refused to toll 
interest "during the periods of delay caused by the NLRB." 
ALJ Sherman rendered her unfair labor practice decision 
against Corbett Electric/Bufco in 1984, but the Board did not 
act until 1988. In the interim, the Board decided John 
Deklewa & Sons, Inc., 282 N.L.R.B. 1375 (1987), altering its 
analysis of s 8(f) collective bargaining relationships. When 
the Board affirmed Judge Sherman, it applied Deklewa retro-
actively. After the Seventh Circuit sustained the Board, 
Bufco I, 899 F.2d at 609, the parties were unable to agree on 
the amount of back pay due. Lengthy supplemental back pay 
proceedings ensued. The Board issued its order fixing the 
amount of back pay due on April 30, 1997. The principal 
amount of the award is $136,556, but Bufco asserts that once 
interest is calculated, the total amount may exceed $300,000.

 Although some of the delay may be attributable to the 
Board, that in itself cannot serve as a basis for tolling the 
award of interest. The Supreme Court has held that "the 
Board is not required to place the consequences of its own 
delay, even if inordinate, upon wronged employees to the 
benefit of wrongdoing employers." NLRB v. J.H. Rutter-
Rex Mfg. Co., 396 U.S. 258, 263 (1969). During the delay, 
Bufco had use of money rightfully belonging to its workers. 
"The return on the money belongs to the victim, not the 
wrongdoer, and interest is the means by which this transfer is 


accomplished." NLRB v. International Measurement & 
Control Co., 978 F.2d 334, 337 (7th Cir. 1992); see also NLRB 
v. Thill, Inc., 980 F.2d 1137, 1141 (7th Cir. 1992); Bagel 
Bakers Council v. NLRB, 555 F.2d 304, 306 (2d Cir. 1977). 
For these reasons, we decline to follow NLRB v. W.L. Miller 
Co., 871 F.2d 745 (8th Cir. 1989), which on similar facts 
concluded that it would be manifestly unjust to award interest 
for the entire period.3

 Bufco also challenges the award of back pay to hiring hall 
applicants. These are would-be employees who were denied 
the opportunity to work for Bufco when the company repudi-
ated its collective bargaining agreements and circumvented 
the Union's hiring hall.4 According to Bufco, neither ALJ 
Sherman nor the Board discussed hiring hall applicants be-
fore the case reached the Seventh Circuit. From this Bufco 
concludes that the court's decision in Bufco I, granting en-
forcement of the Board's order, "constitutes the law of the 
case" and precludes an award to such applicants. There are 
several flaws in Bufco's reasoning. For one thing, the only 
issues the Seventh Circuit addressed, or had to address, dealt 
with the Board's decision to apply Deklewa retroactively, see 
Bufco I, 899 F.2d at 610. The Board's unfair labor practice 
decision, which the court reviewed, had left open the precise 
remedy to be imposed, requiring only that Bufco make "em-
ployees whole for any losses they may have suffered." 291 
N.L.R.B. at 1017 (emphasis added). Deferring the remedy to 
the back pay proceeding is common practice for the Board, a 
practice the Supreme Court and the courts of appeals have 
approved. See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 902 

__________
 3 The Seventh Circuit, in Bufco I, "express[ed] no opinion on 
the Eighth Circuit's finding" in Miller. 899 F.2d at 612 n.8.

 4 "The original paradigmatic hiring hall involved an actual hall 
or facility from which the union operated a full-fledged employment 
agency, screening prospective workers, building and maintaining 
lists of eligible workers, and dispatching those workers in response 
to employer requests. Today's hiring hall [is] more accurately 
described as a 'referral system....' " Pittsburgh Press Co. v. 
NLRB, 977 F.2d 652, 657 (D.C. Cir. 1992).


(1984); Manhattan Eye, Ear & Throat Hosp. v. NLRB, 942 
F.2d 151, 156 (2d Cir. 1991). For another thing, Bufco 
misreads the underlying proceedings. Hiring hall applicants 
were indeed considered. ALJ Sherman found that the bar-
gaining agreements between the Union and NECA "con-
tained clauses that required employer members of the Associ-
ation to hire employees through the Union's referral service." 
She further found that Corbett Electric "used the Union as a 
hiring hall to obtain Corbett Electric's employees." Noting 
that "some of the beneficiaries of the Order may be employ-
ees who will never work for Corbett Electric/Bufco but who 
work out of the Union's hiring hall and would have been 
referred to jobs with Corbett Electric/Bufco if the bargaining 
agreements had been honored," the ALJ ordered notices to 
be posted "at all locations where notices to employees who 
work out of the hiring hall are customarily posted." The 
Board's order approved this remedy. Furthermore, even if 
no explicit mention had been made of these bypassed job 
applicants, a hiring hall remedy is standard fare in cases 
involving unlawful failure to abide by collective-bargaining 
agreements. See Wayne Electric, Inc., 226 N.L.R.B. 409 n.3 
(1976). In Southwestern Steel & Supply, Inc. v. NLRB, 806 
F.2d 1111 (D.C. Cir. 1986), we upheld a Board order "requir-
ing compensation for unit members who would have been 
employed by the Company had it hired in conformity with the 
provision." Id. at 1114. "Even when the Board does not 
expressly extend its make-whole order to would-be employees 
... the order is understood to encompass them." Id. (cita-
tions omitted). The Board's order here directed Bufco to 
"make whole" employees "for any losses they may have 
suffered." Hiring hall applicants who were unlawfully denied 
employment suffered losses for which Bufco is liable. We 
therefore sustain this aspect of the Board's remedy.

 There is nothing to Bufco's related claim that the remedy 
should not include hiring hall counterparts for the work 
performed by Bill and Mark Corbett. The commercial 
collective-bargaining agreement has a clause stating that 
"[n]o member of any firm signatory to this Agreement shall 
himself perform any manual electrical work." It was reason-


able for the Board to find that Bill Corbett, as the owner of 
Bufco's alter ego Corbett Electric, was a "member" of Bufco 
itself. As to Mark Corbett, Bufco argues that "the bulk of his 
work" was residential and that the residential agreement 
contains no such clause. Substantial evidence, however, sup-
ports the Board's conclusion that the majority of Mark Cor-
bett's work was commercial and thus covered by the clause in 
that agreement. In the supplemental proceeding before ALJ 
West, Bufco argued that 15 percent of Mark Corbett's hours 
were residential, meaning, of course, that 85 percent were 
commercial. Moreover, Bill Corbett testified that most of 
Mark's jobs were in "the commercial category."

 We also uphold the Board's decision to pierce the corporate 
veil and hold Bill, Lucinda, and Mark Corbett jointly and 
severally liable for the missteps of Corbett Electric and 
Bufco. In making such a decision, the Board typically applies 
a test derived from federal common law: (1) have the share-
holder and the corporation failed to maintain separate identi-
ties? and (2) would adherence to the corporate structure 
sanction a fraud, promote injustice, or lead to an evasion of 
legal obligations? See White Oak Coal Co., 318 N.L.R.B. 732 
(1995); see also NLRB v. Greater Kansas City Roofing, 2 
F.3d 1047, 1052 (10th Cir. 1993); Labadie Coal Co. v. Black, 
672 F.2d 92, 96 (D.C. Cir. 1982).5 

 The Board's factual findings must be respected if they are 
supported by "substantial evidence on the record considered 
as a whole," 29 U.S.C. s 160(e); see also Universal Camera 
Corp. v. NLRB, 340 U.S. 474, 488 (1951), and the Board's 
legal conclusions will stand unless the Board acted arbitrarily 
or otherwise erred in applying established law to the facts. 
Here there is ample support for the Board's conclusion that 
the Corbetts failed to respect corporate form. Although the 
Corbetts say they "conducted and recorded all corporate 
meetings" and kept "audited financial records," there is also 

__________
 5 Piercing the corporate veil "is a question of federal law when 
it arises in the context of a federal labor dispute." NLRB v. 
Fullerton Transfer & Storage, Ltd., 910 F.2d 331, 335 (6th Cir. 
1990).


evidence that they commingled funds and did not maintain an 
arms-length relationship in their corporate transactions. In 
the supplemental back pay proceeding, ALJ West found 
especially suspicious a lease between Bufco and Marbeck 
Development Company, another company owned by the Cor-
betts.6 After years of paying only minimal rent, Bufco paid 
Marbeck $50,000 on January 31, 1990. This sum was deposit-
ed not in Marbeck's account but in the personal account of 
Lucinda Corbett. Bufco also forgave a $41,381 debt of Mar-
beck's, evidently in lieu of back rent. This was apparently 
money Bufco could ill afford because in February 1990, it 
took out a loan of $40,000. In light of these transactions, 
there was ample support for ALJ West's conclusion, sus-
tained by the Board, that the real property lease was a 
"sham" used to dissipate Bufco's assets.

 As ALJ West wrote, "The natural, foreseeable, and inevit-
able consequences of the Corbett's misuse of corporate assets 
is the diminished ability of the corporate alter egos to satisfy 
the involved statutory remedial obligations." Although there 
is no evidence concerning Bufco's solvency, the Board was 
warranted in believing that adherence to corporate form in 
this instance could very well "lead to an evasion of legal 
obligations," Greater Kansas City Roofing, 2 F.3d at 1052, 
sufficient to justify piercing the corporate veil.

 III

 Bufco's remaining challenges relate to two aspects of the 
Board's back pay order--the calculation of back pay on a 
weekly basis, and the inclusion of four direct employees 
whom, according to Bufco, did not perform unit work.

 Under s 10(c) of the National Labor Relations Act, 29 
U.S.C. s 160(c), once the Board finds that an unfair labor 
practice has been committed, its choice of remedies includes 
the power to order an award of back pay. While the Board 
has wide latitude in "devising procedures and methods which 

__________
 6 Elsewhere, the NLRB describes this company as "Mar Beck, 
Inc."


will effectuate the purposes of the Act," it must fashion a 
remedy that will yield a close approximation of the amount 
due. NLRB v. Brown & Root, Inc., 311 F.2d 447, 452 (8th 
Cir. 1963); see also NLRB v. Laredo Packing Co., 730 F.2d 
405, 407 (5th Cir. 1984); Bagel Bakers Council, 555 F.2d at 
305. In this case, ALJ Sherman ordered loss of wages "to be 
calculated in the manner prescribed in F.W. Woolworth Co." 
The Board modified Judge Sherman's remedy, ordering "Re-
spondents to make whole, as prescribed in Ogle Protection 
Services, ... employees for any losses they may have suf-
fered." In a footnote, the Board explained:

 The judge ordered a quarterly computed back pay 
 remedy. As we find that Bufco is the alter ego of 
 Corbett, that the two entities constitute a single employ-
 er, and that the appropriate units include the employees 
 of both companies covered by the inclusionary language 
 of the residential and [commercial] agreements with the 
 Union, we conclude that the appropriate remedy is to 
 require Respondent to apply the contracts retroactively 
 and to make its employees whole for any losses they may 
 have suffered as a result of Respondent's failure to apply 
 the contracts. When, as here, the amounts due employ-
 ees result from a Respondent's repudiation and failure to 
 apply the terms of a collective-bargaining agreement, and 
 does not involve cessation of employment status or inter-
 im earnings, a quarterly computation is unnecessary and 
 unwarranted.

 In the supplemental compliance proceeding that followed, 
ALJ West ordered, and the Board approved, back pay for 
Bufco's direct employees computed on a weekly basis. (The 
back pay for hiring hall applicants was determined according 
to a different formula.) He justified calculating back pay on a 
weekly basis because employees were paid weekly and thus 
the company's "own weekly cash-flow problems were alleviat-
ed at the expense of the employee's weekly cash flow prob-
lems." Before the Board and in this court, Bufco argued that 
Ogle Protection Services required back pay to be computed 
on an overall or lump sum basis, with excess pay in any given 


week credited to the next.7 The dispute then centers on the 
difference between Ogle Protection Services and F.W. Wool-
worth and how the difference affects the calculation of back 
pay.

 In F.W. Woolworth, 90 N.L.R.B. 289 (1950), the Board 
announced what was then a new method of calculating a back 
pay award. Although previously back pay had been deter-
mined "by computing the difference between (a) what the 
employee would have earned in the position which was dis-
criminatorily terminated and (b) what he actually earned in 
other employment during the entire period commencing on 
the date of discrimination and ending with the date of offer of 
reinstatement," the Board reasoned that this method gave 
employers an incentive to refrain from offering reinstatement 
because "the greater the delay, the greater would be the 
reduction in back pay liability." 90 N.L.R.B. at 291-92. The 
Board therefore ordered that loss of pay should be computed 
on the basis of separate quarterly periods. "Earnings in one 
particular quarter shall have no effect upon the back-pay 
liability for any other quarter." Id. at 293. The Supreme 
Court upheld the Board's methodology in NLRB v. Seven-Up 
Bottling Co., 344 U.S. 344 (1953). 

 Thereafter, in Ogle Protection Services, 183 N.L.R.B. 682 
(1970), the Board concluded that the quarterly computation 
method should not be applied to employees who had not been 
unlawfully discharged and had no interim employment earn-
ings to offset back pay liability. 183 N.L.R.B. at 683. Thus, 
in cases involving the repudiation of a collective-bargaining 
agreement--where employees continue to be employed but 
are not paid according to the union scale--the Board does not 
use a quarterly computation method. See, e.g., Proctor Ex-
press Inc., 322 N.L.R.B. 281, 282 n.7 (1996) ("In the event 
unit employees were laid off or terminated ... backpay shall 
be computed in the manner set forth in F.W. Woolworth 
Co..... In the event that unit employees ... were neither 

__________
 7 Because Bufco was not paying its employees union wages, it 
contends that in some weeks it paid more than what the employees 
otherwise would have earned.


laid off nor terminated, backpay shall be computed in accord 
with Ogle Protection Service[s]."); Louisiana-Pacific Corp., 
312 N.L.R.B. 165, 167 n.11 (1993) (same).

 The Board maintains that "nothing in the language of Ogle 
Protection either forbids the weekly approach the Board used 
here or requires the lump-sum approach Bufco advocated. 
Ogle Protection simply does not speak to the period of time 
that the Board must use in lieu of quarterly computations." 
Perhaps so, but we are still left with a problem. While Ogle 
Protection Services may not mandate a lump sum approach, it 
casts doubt on the use of any segmented periods to calculate 
back pay, regardless whether the period is quarterly, weekly 
or monthly. If Ogle is read to mean "anything-but-quarters," 
as the Board seems to suggest, we cannot understand the 
rationale behind it. Given this analytical gap, we will vacate 
the Board's back pay computation and remand the case for 
reconsideration and a more adequate explanation. Pittsburgh 
Press Co. v. NLRB, 977 F.2d 652, 655 (D.C. Cir. 1992); see 
also Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. 
Ins. Co., 463 U.S. 29, 57 (1983). On remand, the Board 
should explain how calculation of back pay on a weekly basis 
accomplishes the objectives of Ogle Protection Services in 
light of Ogle's rejection of the F.W. Woolworth quarterly 
formula. See Checkosky v. SEC, 23 F.3d 452, 483-84 (D.C. 
Cir. 1994) (separate opinion of Randolph, J.).

 We also deny enforcement of the portion of the Board's 
order awarding back pay to four direct employees--Newman 
Corbett, Timothy Stewart, Roger Hart, and Clifford Rus-
sell--and their hiring hall counterparts. Bufco maintains 
that these individuals did not perform any bargaining unit 
electrical work.8 The evidence the Board cited is exceedingly 
thin, identifying by name just three of the employees. The 
Board relies first on the testimony of a regional compliance 
officer, Patricia Nachand. On cross-examination, however, 
Nachand testified only that she had discussed Newman Cor-
bett, Roger Hart, and Timothy Stewart in her conversation 

__________
 8 ALJ West's decision lists only three of the four disputed 
workers, but awards all four back pay.


with Lucinda Corbett. She appears to have responded affir-
matively to the question, "[I]sn't it true that ... Mrs. Corbett 
... told you on several occasions that Newman Corbett, 
Roger Hart and Timothy Stewart did not perform unit 
work?" At oral argument, counsel for the Board also direct-
ed us to the testimony of Mark Corbett, who stated that all of 
the employees he named performed electrical or "electrical-
related" work. But as the Board's counsel admitted, Mark 
Corbett was not referring to the disputed employees. In fact, 
earlier in his testimony, he said that Tim Stewart performed 
labor-related support help.9

 The Board thinks negative inferences should be drawn 
from Bufco's failure to call its own witnesses on this issue. 
Under the "missing witness" rule, if a person having impor-
tant evidence and peculiarly within the power of one of the 
parties to produce is not called, the factfinder may draw an 
inference that "the missing witness would have given testimo-
ny damaging to that party." United States v. Pitts, 918 F.2d 
197, 199 (D.C. Cir. 1990). Here, the Board could have called 
at least some of the disputed employees as witnesses 10 and so 
drawing the inference would be unwarranted even if this 
factor would have supplied substantial evidence to support 
the Board, which we doubt. The Board's own precedents 
recognize as much. See Plumbers & Steamfitters Local, 242 
N.L.R.B. 1157, 1160 n.10 (1979) ("[S]ince there is no basis for 
inferring [the witness] was not equally available to both sides, 
no adverse inference can be drawn."); Weisser Optical Co., 
274 N.L.R.B. 961, 961 n.4 (1985) (same).

 The Board tells us the case is not really about substantial 
evidence, but about which party bears the burden of proof. 
True enough, in a back pay proceeding, the Board has 
discharged its burden once it shows the gross amount of back 
pay due. The burden then shifts to the employer to establish 
affirmative defenses mitigating liability. See NLRB v. Lare-

__________
 9 Bill Corbett testified that these four employees did not perform 
any electrical work, but the ALJ discredited his testimony.

 10 Newman Corbett passed away prior to the hearing before 
the ALJ.


do Packing Co., 730 F.2d at 407; NLRB v. Brown & Root, 
Inc., 311 F.2d at 454; NLRB v. Mooney Aircraft, Inc., 366 
F.2d 809, 813 (5th Cir. 1966). Still, the Board must show "the 
gross back-pay due each claimant," J.H. Rutter Rex Mfg. Co. 
v. NLRB, 473 F.2d 223, 230 (5th Cir. 1973) (emphasis added), 
not gross back pay liability for the wronged employees as an 
undifferentiated whole. Establishing that an employee is 
actually a member of a given bargaining unit is part of the 
Board's prima facie case. There is no gross back pay liability 
for an employee who is not within the relevant bargaining 
unit. It is not far-fetched to assume that Bufco hired employ-
ees--managers, carpenters, drivers, and so forth--who per-
formed jobs other than residential or commercial electrical 
work. Since the Board failed to make out a prima facie case 
with regard to these four employees, we deny enforcement of 
this part of the Board's order. Consequently, we also deny 
enforcement of the order awarding back pay to the hiring hall 
counterparts of these employees.

 * * *

 The Board's cross-application to enforce its order is grant-
ed with respect to the accumulation of interest, the hiring hall 
remedy, and piercing the corporate veil. As to the four 
disputed employees, we deny enforcement of that portion of 
the Board's order. The calculation of back pay is vacated and 
remanded to the Board for reconsideration.

So ordered.