**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BRINKS, INCORPORATED OF FLORIDA, Respondent.**

No. 87–5525.

United States Court of Appeals, Eleventh Circuit.

April 26, 1988.

Elliot Moore, Deputy Associate General Counsel, N.L.R.B., William M. Bernstein, Paul J. Spielberg, Washington, D.C., for petitioner.

Jeffrey W. Pagano, Epstein, Becker, Borsody & Green, New York City, for respondent.

Before KRAVITCH, Circuit Judge, HENDERSON *, and HENLEY **, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

## I.

Brinks, Inc. of Florida petitions this court for review of a National Labor Relations Board order directing it to bargain collectively with Local 555 of the International Union of Police and Protection Employees. *See Brinks, Inc.,* 283 N.L.R.B. No. 110 (Apr. 23, 1987). The Board certified Local 555 as the bargaining representative of Brinks' employees at its Fort Lauderdale, Florida facility. For several years prior to the events leading to this petition, Brinks' employees at two other facilities, in West Palm Beach and Miami, were represented by Local 390 of the International Brotherhood of Teamsters. From time to time, Local 390 demanded Brinks' recognition as the bargaining representative of the Fort Lauderdale employees as well, but Brinks resisted these demands.

A new attempt to organize Brinks' Fort Lauderdale employees began in 1981 through the efforts of Kenneth Jordan, a tractor-trailer driver employed by Consolidated Freightways at its West Palm Beach terminal. The West Palm Beach employees of Consolidated Freightways were represented by Local 390. Jordan was a mem-

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

ber of Local 390 and served as union steward at the West Palm Beach terminal.

Jordan met Frank Mancini, the Secretary–Treasurer of the International Union of Police and Protection Employees, on a visit to New York City. Mancini suggested that Jordan assume the responsibility of organizing a local labor organization of security guards in Florida. After considering the suggestion, Jordan met again with Mancini and agreed to organize a local organization. Jordan obtained a charter for the local organization that was subsequently designated as Local 555 of the International Union of Police and Protection Employees.

The first meeting of Local 555's organizers took place in June 1981; Jordan was elected President. Local 555 thereafter filed a petition with the National Labor Relations Board, seeking certification as bargaining representative for Brinks' Fort Lauderdale employees. On June 3, 1982, the Board held an election at the Fort Lauderdale facility, at which Local 555 failed to receive a majority of the valid votes cast. The Board set aside the results of the election and directed that a second election be held.[1] Local 555 received a majority of the votes cast at the second election, and the Board certified Local 555 as the bargaining representative of Brinks' Fort Lauderdale employees.

Brinks refused to bargain with Local 555, so Local 555 filed a charge with the Board alleging that Brinks' refusal to bargain violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (a)(5). The Board issued a complaint on the charge. In its answer, Brinks asserted *inter alia* that the Board had illegally certified Local 555 as the bargaining representative in violation

of section 9(b)(3) of the NLRA, 29 U.S.C. § 159(b)(3):

[N]o labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

It is undisputed that Brinks' Fort Lauderdale employees are "guards" within the meaning of the statute and that Local 390 is "an organization which admits to membership[ ] employees other than guards." The only significant question for our purposes is whether Local 555 "is affiliated directly or indirectly" with Local 390. If so, then the statute prohibits the Board from certifying Local 555 as the representative of the Fort Lauderdale guards.

An administrative law judge determined that Local 555 was not affiliated directly or indirectly with Local 390. In so concluding, the ALJ rejected Brinks' primary contention that Jordan's dual service as president of Local 555 and steward of Local 390 created an indirect affiliation between the two organizations. The ALJ first dismissed Brinks' argument that the mere existence of common officers could constitute an affiliation in violation of the NLRA. Rather, the ALJ believed that to establish its claim of affiliation, Brinks was required to show that Local 555 "was not free to formulate its own policies and courses of action." The ALJ found no "affirmative evidence" that Local 390 had attempted to control Local 555 through Jordan and other common officers.[2] The ALJ also distinguished a line of National Labor Relations Board decisions in which the Board concluded that concurrent service as an officer of both a guard union and a non-guard union had created an indirect affiliation.

---

**1.** Local 555 objected to Brinks' conduct during the period before the election, alleging that Brinks had implicitly threatened its employees with the loss of employment if they voted for Local 555 as their representative. A hearing officer concluded that Brinks had made "quite clear" to its employees that the future of their jobs and the continued existence of the Fort Lauderdale office were dependent on the results of the election. The hearing officer recommended that the union's objections to the election be sustained. The Board adopted the hearing officer's findings and recommendations.

**2.** Steve Hochauser and John Pluchino, both Local 390 stewards at times, also served respectively as Recording Secretary and Secretary–Treasurer of Local 555.

In those cases, according to the ALJ, the officers in question held policy-making positions of high responsibility in the non-guard union. By contrast, Jordan held office as steward of Local 390 at the pleasure of the president of Local 390, received no pay for his service as a steward, played no part in Local 390's collective bargaining sessions, and exerted no influence on Local 390's policy decisions. Moreover, the ALJ believed that even in the "common officer" cases, the Board had not based its findings of affiliation solely on the commonality of officers but also on a showing that the guard union was under the control of the non-guard union. As the ALJ found no evidence of such control, he ordered Brinks to bargain with Local 555. A three-member panel of the Board adopted the ALJ's order.

## II.

### A.

To understand the issues in the case, it is necessary to review the origin and purposes of section 9(b)(3). That section is a statutory exception to the Board's otherwise broad discretion in determining appropriate bargaining units. Congress added section 9(b)(3) as an amendment to the NLRA largely to overrule the Supreme Court's decision in *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947). In *Jones & Laughlin*, the Supreme Court reversed a decision by the Sixth Circuit denying enforcement of a Board order directing the employer to bargain with the United Steelworkers of America. *See NLRB v. Jones & Laughlin Steel Corp.*, 146 F.2d 718 (6th Cir.1944), *vacated and remanded for consideration of mootness*, 325 U.S. 838, 65 S.Ct. 1413, 89 L.Ed. 1965 (1945), *adhered to on remand*, 154 F.2d 932 (6th Cir.1946), *rev'd*, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947).

The Steelworkers had represented Jones & Laughlin's production and maintenance employees for many years and had recently sought certification as bargaining representative of Jones & Laughlin's plant guards as well. The Board certified Jones & Laughlin's "patrolmen, watchmen, firemen, and dump laborers" as a bargaining unit represented by the Steelworkers. In reviewing the Board's decision, the Sixth Circuit stressed the obligation of the plant guards to protect their employers' property (as well as to keep the peace, for the guards were deputized as municipal police officers). The court concluded that when the plant guards "were inducted into the Unions and became subject to their orders, rules and decisions, the plant protection employees assumed obligations to the Unions and their fellow workers, which might well in given circumstances bring them in conflict with their obligation to their employers." 146 F.2d at 722; *accord* 154 F.2d at 935 (stressing guards' obligation, as deputized peace officers, to keep the peace). The possibility that the guards would be subject to a division of loyalties—between the general fidelity to which they as members would owe to the Steelworkers' Union, and the particular duty which they as guards would owe to their employer—rendered the Board's decision to permit the Steelworkers to represent both the guards and the other production employees insupportable.

The Supreme Court reversed the Sixth Circuit, but a House–Senate conference committee considering amendments to the NLRA endorsed the Sixth Circuit's reasoning. In amendments to the NLRA designed to separate guard unions from other bargaining units, Congress prohibited not only the certification of any unit representing both guards and non-guards but also the certification of a unit of guards affiliated "directly or indirectly" with a unit representing non-guards. "Congress clearly intended by Section 9(b)(3) that the union representing guards should be completely divorced from that representing nonguard employees." *Mack Manufacturing Corp.*, 107 N.L.R.B. 209, 212 (1953). In separating guard and non-guard unions, Congress sought to assure employers of a core of faithful employees that would not be subject to a possible conflict of loyalties during a dispute between an employer and a union representing non-guards. *Wells Fargo Ar-*

*mored Service Corp.*, 270 N.L.R.B. 787, 789 (1984).

Decisions by courts and by the Board since the enactment of section 9(b)(3) have made clear that the statutory term "guards" includes not only plant guards protecting the employers' own property but also persons, such as armed couriers, employed to protect the property of an employer's customers. *See Drivers Local No. 71 v. NLRB*, 553 F.2d 1368 (D.C.Cir.1977); *NLRB v. American District Telegraph Co.*, 205 F.2d 86 (3d Cir.1953); *Armored Motor Service Co.*, 106 N.L.R.B. 1139 (1953). Under the rationale of these decisions, guards employed for the protection or safe transport of *another* company's property might well be subject to a conflict if they encountered pickets at that company staged by a union with which their own union was affiliated. "A conflict of loyalty could arise, for example, if the guards should be called upon to deliver money or valuables to one of their customers whose employees were represented by the same union as represented the armored car guards, and the employees of the customers were on strike and picketing the premises of the employer." *Armored Motor Service Co.*, 106 N.L.R.B. at 1140. "The potential for divided loyalty is present whether or not the same employer is involved." *Truck Drivers Local Union No. 807 v. NLRB*, 755 F.2d 5, 9 (2d Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 225 (1985); *accord Drivers Local No. 71*, 553 F.2d at 1373; *Wells Fargo Armored Service Corp.*, 270 N.L.R.B. at 789.

### B.

In reviewing an order of the Board, we bear in mind several principles relevant to our standard of review. The Board's rulings, "when reached on findings of fact supported by substantial evidence on the record as a whole, should be sustained by the courts unless its conclusions rest on erroneous legal foundations." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). We must, however, examine the Board's deci-

sions to ensure that "its statutory interpretation has a reasonable basis in law," and " 'reviewing courts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " *NLRB v. Deauville Hotel*, 751 F.2d 1562, 1567 (11th Cir.1985) (quoting *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). Moreover, "an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)).

In this case, the ALJ believed that some demonstration that Local 555 was actually controlled by a non-guard union was essential to a finding of "affiliation" within the meaning of section 9(b)(3). Relying on this construction of the statute, the ALJ concluded that, as Local 555 was not controlled by Local 390, the two unions were also not affiliated.

■ This in our view is an erroneous understanding of section 9(b)(3). The statute prevents "affiliation," not merely "control." *See, e.g., Schenley Distilleries, Inc.*, 77 N.L.R.B. 468 (1948) (Board refused to certify guard union whose charter declared it to be affiliated with American Federation of Labor but recited no facts demonstrating that guard union lacked independence). The evils that Congress sought to prevent include not only the domination of guard unions by non-guard unions, but also the potential for conflict of loyalties on the part of an employer's supposedly most faithful and trustworthy employees when encountering demands by another union with whom they share some relation.

The Board previously has emphasized that a realistic *potential* for conflict of loyalties precludes certification of a guard union. In *Wells Fargo Armored Service Corp.*, 270 N.L.R.B. 787 (1984), the Board held that an employer could withdraw its

voluntary recognition of a "mixed" guard union, which either represented non-guards as well or was affiliated with a union that represented non-guards. *Id.* at 787 n. 2.[3] The Board stressed the *"potential* for a conflict of loyalties" created by "mixed" guard unions as the rationale for the statutory preclusion against certification of mixed unions. *Id.* at 789 n. 10 (emphasis in original). The Board also noted that on at least one occasion in the *Wells Fargo* case, the "potential" conflict had turned into a reality. *Id.*

We imply no criticism of Board decisions refusing to certify a guard union based on evidence demonstrating that a guard union was simply a "front" for a non-guard union or that a guard union was subtly but actually controlled by a non-guard union. *See, e.g., Magnavox Co.*, 97 N.L.R.B. 1111, 1113 (1952). The Board's previous decisions make clear, however, that the *potential* for conflict created by the existence of common officers presents a sufficient reason for refusing to certify a guard union. In *Brinks, Inc.*, 274 N.L.R.B. 970 (1985), the Board refused certification of a guard union partly because the Secretary–Treasurer of the guard union was an elected trustee of a non-guard union. The Board was "persuaded that while the [guard union] maintains no formal affiliation with the [non-guard union] it is indirectly affiliated with that labor organization *and* that the record indicates that the [guard union] lacks freedom and independence in formulating its own policies and deciding its own course of action." *Id.* at 971 (emphasis added). In *Armored Transport of California, Inc.*, 269 N.L.R.B. 683 (1984), the Board refused certification upon a showing that the two individuals seeking to represent guard employees were also business agents of a non-guard union charged with negotiating and administering collective bargaining agreements. No showing was required in that case that the proposed representation of the guards was a ruse for actual control by the non-guard union; the existence of common officials demonstrated an indirect affiliation between the two

unions. In *Willcox Construction Corp.*, 87 N.L.R.B. 371 (1949), the president of the guard union served also as president of an "affiliate" of a non-guard union, and three vice presidents of the guard union served as officers of a non-guard union. The Board denied certification even though the record did not demonstrate that the guard union had received financial assistance from the non-guard union. *Id.* at 373.

Judicial decisions also have emphasized the potential for divided loyalties as an animating concern to section 9(b)(3). The Second Circuit noted that the broad language used by Congress in section 9(b)(3) "encompasses not merely divided loyalties at a company plant, but the potential for divided loyalty that arises whenever a guard is called upon to enforce the rules of his employer against any fellow union member." *Truck Drivers Local Union No. 807*, 755 F.2d at 9. This potential conflict of loyalties may affect armed couriers as well. *See id.* (citing *Armored Motor Services Co., Inc.*, 106 N.L.R.B. 1139 (1953)).

In *NLRB v. American District Telegraph Co.*, 205 F.2d 86 (3d Cir.1953), the Third Circuit denied enforcement of a Board order compelling an employer that operated alarm systems for customers to bargain with a certified union representing both guard and non-guard employees. American District Telegraph's "operating" employees were not guards within the meaning of section 9(b)(3), but its "plant" employees were statutory guards, as their duties required them to protect customers' premises against burglary and fire. The Board had placed the two groups of employees in the same bargaining unit, fearing the possibility for conflict if American District Telegraph's guard employees were represented by the same union that represented the customer companies' guards. According to the Third Circuit, the Board had overlooked the potential for divided loyalty that was far more relevant to the statutory scheme, namely the possible con-

---

**3.** It is not clear from the facts of *Wells Fargo* whether the same union represented guards and non-guards or whether the two groups of employees were represented by related unions.

flict between the guards' duty to their employer and their loyalty to affiliated unions:

> In the event of an alarm from a strike-bound subscribing plant respondent's guards might be forced to cross a picket line of their fellow unionists in order to fulfill the primary obligation of both their employer and of themselves as guard employees. The Board argues at some length against the probability of that sort of incident taking place. It fails to dispose of the problem satisfactorily. If the Board could visualize such a situation it does seem that it would then be forced to concede that 9(b)(3) would effectually prevent its occurrence. Testimony in this record shows it could happen. The union representative indicated that if the particular union directed respondent's guards to observe the picket line it would expect compliance with that order.

*NLRB v. American District Telegraph Co.*, 205 F.2d at 90.

In summary, the National Labor Relations Board and the courts have established that a realistic potential for a conflict between loyalty to an employer and fidelity to a non-guard union is sufficient to deny certification of a guard union on grounds of "affiliation." The order of the ALJ in the instant case departed from this understanding of section 9(b)(3).

### C.

As the ALJ recognized, Brinks relied heavily on the concurrent service of Jordan and others as both Local 390 stewards and Local 555 officers to support its case of indirect affiliation. The ALJ stated that "the issue is whether [stewards] are officers with stature sufficient to establish that their concomitant participation in the operation of Local 555 manifests its 'affiliation' with Local 390." Although the ALJ made no explicit findings on this issue, he presumably concluded that stewards of a non-guard union are not officers with sufficient stature to establish affiliation when those stewards serve concurrently as officers of a guard union. The ALJ distinguished several cases in which the Board

had relied on the existence of common officers to find "affiliation," on the ground that those cases involved paid, elected, policy-making officers of the non-guard union. For example, *Brinks, Inc.*, 274 N.L.R.B. 970 (1985), involved a Secretary–Treasurer of a guard union who served also as trustee of the non-guard union. In *Armored Transport, Inc.*, 269 N.L.R.B. 683 (1984), the officers in question were business agents for the non-guard union. In *Willcox Construction Co.*, 87 N.L.R.B. 371 (1949), the guard union officers served as secretary of a non-guard union, vice president of a non-guard union, and president of a council established to settle disputes among affiliated non-guard unions.

■ The ALJ's opinion gave insufficient consideration to the *potential* for divided loyalties in situations where guard and non-guard unions share officers. For example, after the ALJ noted that steward positions in Local 390 were unpaid and were appointed by the local's president, he stated, "it is at least questionable that the unpaid Local 390 steward jobs were more important to Jordan and his colleagues than were the factors which motivated them to start a guard union." We do not believe that Brinks was required to demonstrate that Jordan would *necessarily* be more faithful to the non-guard union that to his obligations as president of a guard union. As we have explained, the realistic *potential* for divided loyalties warrants the complete separation of guard and non-guard unions. We can readily conceive of situations in which Jordan, and the members of the non-guard union over which he presides, might well face divided loyalties. If non-guard employees organized by Local 390 struck Consolidated Freightways, or any other company with which Brinks had a commercial relationship, the union might well face a conflict between its particular obligation to Brinks and its general loyalty to Local 390. Section 9(b)(3) entitles Brinks to some assurance against the potential for such a conflict.

■ Moreover, to the extent that the ALJ concluded that the position of steward was insufficiently important to subject its

occupant to a possible conflict of loyalties, this conclusion is not supported by substantial evidence. It is not particularly relevant that Local 390 does not pay its stewards. Some of the Board's previous "common officer" decisions mention payment for services as a factor supporting a finding of "affiliation," to be sure, but such payment is insufficient to distinguish those cases from the instant case. In *Brinks, Inc.*, for example, one common officer was paid "in excess of $600," hardly a grand sum, for his services to the non-guard union. 274 N.L.R.B. at 971. In *Willcox Construction Co.*, the president of the guard union received a salary from the guard union but only an "expense allowance" from the non-guard union. 87 N.L.R.B. at 373.

Nor did the ALJ even address the undisputed record evidence about the essential role of the steward in union effectiveness. The ALJ recited only those duties which a steward does not have: a steward does not serve on the local's policy-making board and does not (usually) participate in the negotiation of collective bargaining agreements. The potential for divided loyalties is not necessarily limited, however, to the highest elected officials in a union. The record amply demonstrates that the position of steward requires such loyalty and dedication to the non-guard union that its occupant might well be subject to a division of loyalties if he also served as officer of a guard union. For example, the Teamsters' "Steward's Manual" admonishes stewards as follows:

> The role of the Steward in the Teamsters Union is the key to the effectiveness of the entire Union.
> As a Steward in your local, you are part of a team working to carry out the program of our union. Your contribution to that effort can help substantially in making the Teamsters Union the kind of union our members need and deserve.
> [B]eing an effective spokesman for Teamsters members at the worksite is the key to effective grievance handling. When handling employee problems, the Steward must view his position as equal to that of the first line supervisor. And,

at the same time, the Steward must provide the basic link between the membership and the officers and representatives of the local.

It is the Steward, then, who works daily with the members at the worksite and with management. It is here that labor-management relations stand or fall.

The Steward ...

1.  Maintains constructive relationships between union and management (the Steward is a vital link in these relationships).

2.  The Steward serves as the spokesman of the local union at the worksite.

3.  Protects working conditions as well as the dignity and security of the jobs of all Teamster members.

4.  Acts and talks unionism.

5.  Regularly attends meetings of the Local Union and gets others to attend.

6.  Builds members' understanding of the contract.

7.  Polices the agreement. In doing this, the Steward:

    a.  handles grievances; and,

    b.  polices the contract by watching for violations and taking them up with Union representatives.

In summary, we cannot uphold the Board's conclusion that concurrent service by Local 555's officers as Local 390's stewards would not create a potential for divided loyalties. Indeed, the record compels the opposite conclusion.

ENFORCEMENT DENIED.