178 F.3d 543
 161 L.R.R.M. (BNA) 2449
 THE WACKENHUT CORPORATION, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.
Santa Clara County Public Safety Officers' Association, Intervenor.
 No. 98-1319.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 5, 1999.
Decided June 8, 1999.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 John W. Powers argued the cause for petitioner/cross-respondent. On the briefs was Brian T. Ashe. Ronald A. Lindsay entered an appearance.
 Anne M. Lofaso, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney. David A. Rosenfeld entered an appearance.
 Before: WALD, RANDOLPH and GARLAND, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 The Wackenhut Corporation ("Wackenhut"), a company which provides security guard services, argues that a union of 11 guards[1] employed by Wackenhut was improperly certified because it is impermissibly affiliated with a union that has non-guard members, in violation of the Labor-Management Relations Act, 29 U.S.C. § 159(b)(3) ("the Act"). The National Labor Relations Board ("Board" or "NLRB") rejected this argument. We find that although the challenged unit of guards was undoubtedly reliant on a member of a non-guard union for advice and assistance, the Board's conclusion that the unions were not "indirectly affiliated" within the meaning of the Act is supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Thus, we grant the Board's cross-petition for enforcement and deny Wackenhut's petition for review.
 
 I. BACKGROUND
 
 2
 Wackenhut provides security services for the Santa Clara Valley Transit Authority. In 1998, the Santa Clara County Public Safety Officers' Association ("Officers' Association"), a newly-spawned union of guards, was certified to represent Wackenhut's full- and part-time security officers who service the transit authority. The company refuses to bargain with the Officers' Association on the ground that the union is ineligible for certification because of the help the guards received from the business agent and special advisor for the Northern California Regional Council of Carpenters ("Carpenters"), a union which admits non-guards to its membership.
 
 A. Legal Background
 
 3
 Wackenhut contends that the help the Officers' Association received from the Carpenters' agent violated section 9(b)(3) of the Labor-Management Relations Act, 29 U.S.C. § 159(b)(3), which provides that:
 
 
 4
 The Board shall decide in each case whether, in order to assure employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: Provided, [t]hat the Board shall not ... (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.
 
 
 5
 29 U.S.C. § 159(b)(3). Congress drafted this provision "to minimize the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member." Drivers, Chauffeurs, Warehousemen and Helpers, Local No. 71 v. NLRB, 553 F.2d 1368, 1373 (D.C.Cir.1977); see also NLRB v. Brinks, Inc. of Fla., 843 F.2d 448, 451 (11th Cir.1988) ("In separating guard and non-guard unions, Congress sought to assure employers of a core of faithful employees that would not be subject to a possible conflict of loyalties during a dispute between an employer and a union representing non-guards.") (citing Wells Fargo Armored Serv. Corp. v. Truck Drivers Local Union No. 807, 270 N.L.R.B. 787, 789, 1984 WL 36553 (1984)).
 
 
 6
 There is no dispute that the employees at issue here are "guards" within the meaning of the Act, that the Carpenters admit non-guards to membership, and that the two unions are not "directly affiliated" under the Act. The issue is whether the unions are "indirectly affiliated." The Board's position that there is no unlawful "indirect affiliation" between these two unions is rooted in a series of prior Board decisions issued shortly after the Act's passage in 1947. In those cases, the Board determined that Congress' goal of ensuring that guards remain faithful to their employers would not be well-served by a strict interpretation of the Act that forbad fledgling guards' unions from seeking and receiving any form of assistance from established non-guard unions. The Board, interpreting the meaning of "indirect affiliation," ruled that a guards' union does not violate the Act if it receives help in its formative stages from a union of non-guards. This doctrine was based in large part on practical necessity; a new union that is barred from receiving any measure of assistance from a more established one is likely never to get off the ground. Thus, in International Harvester Co., 81 N.L.R.B. 374, 1949 WL 8656 (1949), the Board held that a guards' union, conscientiously engaged in the process of breaking off from the local CIO affiliate in order to comply with the Act, was still capable of formulating its own policies and deciding its own course of action, even though the head of the CIO local represented the guards' union before the employer in a bid for recognition, the election ballots for officers bore the non-guards' union's name,[2] and the guards' union continued to use the CIO local's hall rent-free. Similarly, when the unionized guards at a Westinghouse Electric Corporation plant severed ties with the local CIO non-guard affiliate, the Board held that it was permissible for the non-guard affiliate to continue to let the guards use its union hall, and for the non-guards' chief steward to help at the guards' first organizational meeting. See Westinghouse Elec. Corp., 96 N.L.R.B. 1250, 1951 WL 10564 (1951). The Board ruled that indirect affiliation existed in one case, however, when two informal organizational meetings of a guards' union were held rent-free at a local non-guard CIO affiliate's union hall while other labor organizations were required to pay rent; the CIO local's secretary, treasurer and president attended those meetings, assisted in organizing guards and electing officers, and drafted the guards' constitution and bylaws; the CIO local had union cards printed for the guards; and the guards' union collected no dues and had no formal organizational meetings. See Magnavox Co., 97 N.L.R.B. 1111, 1112, 1952 WL 11202 (1952). The Board held that while assistance from a non-guard union during a guards' union's infancy does not necessarily establish indirect affiliation, the "extent and duration" of the aid from the CIO affiliate in Magnavox indicated that the guards' union "ha[d] [n]ever taken any action without the assistance of Local 910 or its officers." Id. at 1113, 1952 WL 11202; see also Mack Manuf. Corp., 107 N.L.R.B. 209, 1953 WL 10904 (1953) (finding indirect affiliation where committeeman of local CIO non-guard affiliate conducted most, if not all, of actual soliciting and organizing, CIO leader witnessed the union cards, and testimony showed that CIO leader stated publicly that he had organized the guards and they would report to him). The upshot is that a nascent guards' union may receive help from a non-guards' union, but to avoid the "indirect affiliation" prohibited by the Act, the extent and duration of the unions' contact must demonstrate that they ultimately became "completely divorced" from each other. Id. The substantive measure of "completely divorced" is whether "the extent and duration of [the guard union's] dependence upon [the non-guard union] indicates a lack of freedom and independence in formulating its own policies and deciding its own course of action." Magnavox, 97 N.L.R.B. at 1113, 1952 WL 11202.
 
 B. Procedural Background
 
 7
 Because the procedural history of this case is relevant to whether the Board properly denied consideration of certain evidence presented by Wackenhut (discussed in the next section), we set it forth in some detail. The Board's regional office conducted a pre-election representation hearing on the affiliation issue on September 3, 1997. On September 30, 1997, the Regional Director issued his Decision and Direction of Election, ruling that the Officers' Association and Carpenters were not unlawfully affiliated with each other. J.A. at 120. Wackenhut requested Board review of the decision, and the Board denied review on November 3, 1997. Id. at 270. An election was held November 5, and with 8 eligible voters voting, the union won unanimously save for one challenged ballot. Based on new evidence, Wackenhut asked the Board on November 10 to reconsider its November 3 order denying review, and two days later filed timely objections to the election; the motion to reconsider and the objections were based solely on the union's alleged affiliation with the Carpenters, id. at 279, 289. Wackenhut supplemented its motion to reconsider with new evidence by a letter to the Board dated December 3. Id. at 301. On March 16, 1998, the Board denied the motion for reconsideration, id. at 305, and the next day, the Regional Director issued a Supplemental Decision and Certification of Representative, id. at 307. On April 13, Wackenhut asked the Board to review the certification decision based on more new evidence, which review was denied on May 6, 1998. Id. at 532. On May 7, after receiving a letter from the company indicating its refusal to bargain, the Officers' Association filed an unfair labor practice charge alleging that Wackenhut had refused to bargain collectively with the union in violation of sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5). A complaint issued May 14. Subsequently, the Board granted the General Counsel's motion for summary judgment, denied Wackenhut's request for an evidentiary hearing on July 10, 1998, and ordered the employer to bargain with the Officers' Association. J.A. at 1814.
 
 C. The Record Before the Board
 
 8
 Representation proceedings before the Board are not subject to direct judicial review because they do not result in a final agency order. See, e.g., Family Serv. Agency San Francisco v. NLRB, 163 F.3d 1369 (D.C.Cir.1999); 29 U.S.C. § 160(e)-(f). An employer seeking review of the record in a representation proceeding must refuse to bargain with the union, suffer an unfair labor practice charge, and in challenging the charge rely on the objections and corresponding evidence raised in the representation proceeding. That is what Wackenhut has done in this so-called "technical refusal-to-bargain" proceeding. Therefore, we review the record in the representation proceeding in order to determine whether the Officers' Association was properly certified and whether Wackenhut properly refused to bargain with the association.
 
 
 9
 At the pre-election hearing on the affiliation issue, the Board's hearing officer took testimony from Dennis Murray, the vice president of the Officers' Association, and Mel Sakata, the agent for the Carpenters who served as the association's agent and then advisor.[3] See J.A. at 221 (testimony of Sakata) (stating he is a member and agent of Carpenters). The testimony showed that Sakata first met Pascual Oliveres, Jr., who became the president of the association, at a gathering of Wackenhut police officers in July 1997. See id. at 204. Oliveres introduced Sakata to Murray and other guards on July 27, 1997, at an organizational meeting of Wackenhut guards employed by the transit authority. See id. at 168. Murray recalled that Sakata attended five or six early meetings, which were held rent-free at the Carpenters' meeting hall, and that the Officers' Association held an additional four or five that were not at the Carpenters' hall and that Sakata did not attend. See id. at 174-76. At the meetings Sakata attended, Murray recalled, Sakata's role consisted of answering questions posed by the union members. See id. at 174; see also id. at 211 (testimony of Sakata). Sakata obtained copies of other unions' constitutions and bylaws--specifically, those of the Bay Area Rapid Transit Police Officers' Association--for the Santa Clara County Officers' Association's drafting committee to use. See id. at 181. According to Sakata, on August 3, he helped the association fill out its LM-1 Organizational Report for filing with the Board. See id. at 144. On the form, Sakata simply indicated the sections of the association's bylaws and constitution that govern certain union practices and procedures; he did not sign the form himself (it was signed by the association's president and secretary). Sakata was, however, named in the form as the person authorized to receive mail for the association because, according to Murray, "he was kind enough to volunteer to receive mail for us," and the 11-guard association did not have its own office or post office box. See id. at 179-80.[4] Sakata also filled out a representation petition for the guards--he checked off boxes on a type-written form--and sent it to the guards' law firm for filing. See id. at 247. At around this time (some time in early August), the association gave Sakata a "permission card" to act as an "agent." See id. at 170-71. It does not appear that Sakata's role as an agent was ever formally defined, but the tasks Sakata actually performed included sharing the Carpenters' office supplies, meeting facilities and staff with the Officers' Association, see id. at 195, "hand[ing] out" union authorization cards, see id. at 202,[5] and referring the association to the Carpenters' law firm, which now represents the association pro bono, see id. at 199. In addition, Sakata sent letters on Officers' Association letterhead to the Santa Clara County Board of Supervisors and to the transportation authority, notifying them of the organization effort and requesting that Wackenhut allow the association to engage in lawful organizing activities. See id. at 217-22.[6] Murray testified that he did not know that Sakata had actually written letters to these bodies, but he acknowledged that Sakata had been authorized to contact them to "warn[ ] them so that they wouldn't be caught off guard if [the unionization drive] became an issue." Id. at 186. Finally, Sakata composed a letter dated August 12, 1997, from the association to Wackenhut that asked the company to recognize the Officers' Association as the collective bargaining unit for 11 security guards. See id. at 105. As he was authorized to do, Sakata signed the letter as the association's "agent."
 
 
 10
 In sum, Sakata testified that he performed whatever services the association requested of him, see id. at 205, and that it would "please [him] very much" to continue to help the association through collective bargaining, see id. at 208. Murray described Sakata's role as "giving us advice on the process that we needed to go through to get recognition." Id. at 168. Murray also stated in uncontested testimony that Sakata would not participate in collective bargaining because "[w]e have a bargaining committee that includes myself, and that would really be our job." Id. at 172.
 
 
 11
 Based on this record, the Regional Director found that: (1) Sakata provided "substantial unpaid assistance" to the association; (2) Sakata obtained free meeting space and authorized the association to use the Carpenters' mailing address and telephone number; (3) Sakata obtained authorization cards for the association to use; (4) Sakata wrote on the association's behalf to Wackenhut and other local political figures; (5) Sakata "assisted" the association with "drafting its constitution and bylaws and filing its initial LM-1 statement"; and (6) the association planned to continue to use Sakata "in the near future, including for the possible negotiation of an initial collective bargaining agreement with the Employer." See id. at 120-23.[7] The Regional Director applied the doctrine that a guards' union in its formative stages may receive assistance from a non-guards' union without creating a forbidden affiliation, and concluded that the two unions were not "indirectly affiliated" within the meaning of the Act.
 
 
 12
 In the present case, there is no question that Sakata played an important part in the initial formation of the [Officers' Association] and continues to play a significant part in its current organizing activities among the Employer's armed security personnel. However, I also note that Sakata's assistance to the [association] was provided at a time when the [association] was plainly still in its "formative stages." The [association] had come into being just about a month prior to the hearing and its officers and directors have little, if any, experience in organizing or administering a union. In addition, the [association's] organizing activities among the Employer's armed guards appears to be its first venture in the area and its current membership also appears very small, probably under a dozen members.
 
 
 13
 Id. at 122.
 
 
 14
 After the election in which the association prevailed, the Board, in two separate orders, considered four other incidents raised by Wackenhut that allegedly showed indirect affiliation between the Officers' Association and the Carpenters. In its November 10 motion for reconsideration of the Board's denial of review of the Direction of Election based on new evidence, Wackenhut asked the Board to consider two incidents that occurred around or after the time of the election and that Wackenhut had not been able to raise prior to the election. First, Wackenhut contended that before the election, Sakata contacted a regional Board official to protest Wackenhut's "Excelsior list" of employees eligible to vote, and that during the election he questioned a Board agent about the authority of a Wackenhut representative to tally ballots. See id. at 281-82, 285. Second, outside of the polling area on the day of the election, Sakata told a Wackenhut manager that it was time to sit down and bargain to " 'get these guys an increase.' " Id. at 287 (affidavit of Max Marcel, Wackenhut office manager). Wackenhut raised a third incident in its supplemental filing with the Board on December 3, 1997: a letter dated November 18, 1997 that Sakata sent to Wackenhut as the association's "special advisor" and "agent," in which Sakata asked the company to designate a bargaining agent. See id. at 304. In its March 16, 1998 order, the Board reviewed all three of these additional incidents but denied reconsideration of its refusal to review the Direction of Election. Regarding the first two incidents, the Board concluded that "[t]here is no indication that Petitioner [the Officers' Association] has chosen Sakata as its negotiator; that the Petitioner has given Sakata authority to formulate any bargaining proposals; that Sakata has, in fact, put together any proposals; or that Petitioner no longer intends to rely on its bargaining committee." Id. at 305 (March 16, 1998, denial of reconsideration of denial of review). Addressing the third incident (raised in Wackenhut's December 3 letter), the Board concluded that "[t]here is no indication in the letter that Sakata would be involved in the negotiations. Further, according to the Petitioner, its vice president sent a letter dated November 28, 1997, to the Employer stating that Sakata is 'no longer authorized to act as an agent of the [Petitioner]' and would 'continue to serve only as an advisor.' The letter also designates the Petitioner's vice president as the 'duly authorized agent and spokesperson of the [Petitioner].' " Id. at 305-06.[8]
 
 
 15
 Finally, in its May 6, 1998 order denying Wackenhut's request for review of the Regional Director's certification, the Board considered a fourth incident, which Wackenhut raised for the first time in its April 13 request for review of the Regional Director's certification decision. On March 17, 1998, according to the company, Sakata was present at an unemployment hearing on a claim filed by a member of the association's bargaining unit. Sakata reportedly sat a foot away from the former employee and they "whispered to each other and exchanged notes." Id. at 522. The Board declined to reverse the Regional Director's decision based on this incident, finding that "the Employer presents no evidence that Sakata was acting as an agent for the Petitioner." Id. at 532.
 
 
 16
 II. ADDITIONAL PROFFERED EVIDENCE OF AFFILIATION
 
 
 17
 These events formed the record that the Board considered when it ordered Wackenhut to the bargaining table. See J.A. at 1814. However, Wackenhut argues that during the representation proceeding, the Board erred in declining to consider three additional incidents showing "indirect affiliation." Wackenhut raised this new evidence in its April 13 request for review of the Regional Director's certification. The Board declined in its May 6, 1998 order to consider the evidence because it was raised in an untimely fashion. Wackenhut contended that on December 3, 1997, Sakata met and conferred with voting unit members before a state labor commission hearing on a wage-and-hour claim; that on January 27, 1998, Sakata appeared at a Wackenhut office and asked to see the personnel file of a discharged voting unit employee; and that on February 5, 1998, Sakata appeared at a transit authority meeting and informed the transit representatives that the association would strike if Wackenhut refused to bargain. See id. at 522-31.
 
 
 18
 We find that the Board was well within its authority in deciding that these incidents should have been raised prior to the Board's March 16, 1998 denial of reconsideration of the Direction of Election and the Regional Director's March 17, 1998 certification order. As the Board found in its May 6 order, "[t]he Employer had the opportunity and the obligation to present the new evidence it wished to have considered by the Board during those proceedings, and it has failed to explain the reason it did not previously adduce these facts." Id. at 532. The Board noted that while the NLRB Casehandling Manual allows some latitude for parties to submit later adduced evidence in support of post-election objections, it also states, "An objecting party normally should not be permitted to 'piecemeal' the submission of evidence but should be required to disclose promptly all the evidence in support of his/her objections. Absent the timely receipt of evidence, the Regional Director should overrule the objections." NLRB Casehandling Manual § 11292.5; see also 29 C.F.R. § 102.69(a)-(c). Thus, the Regional Director has some discretion to consider late evidence but is not required to accept it (in fact, he is discouraged from so doing), and by the same token, barring extraordinary circumstances, the Board is certainly not required to order the Regional Director to accept it. In this case, the Board acted reasonably in refusing to reconsider a final ruling on post-election objections based on conduct that occurred well before the final ruling issued. Cf. Kwik Care Ltd. v. NLRB, 82 F.3d 1122, 1126-27 (D.C.Cir.1996) (upholding Regional Director's reasonable use of discretion in conducting a mail-ballot election, based on the procedural guidance contained in the Casehandling Manual).
 
 
 19
 Wackenhut urges us to read the Casehandling Manual as applying only to late-filed evidence in support of objections to the way an election was conducted. Therefore, it says, the Manual should not bar Wackenhut from later presenting evidence, such as these additional incidents, that is relevant to the association's general eligibility for certification and not to election-related conduct. However, even assuming that the distinction between objections to the association's qualifications and objections to its electoral conduct is relevant for this purpose, and thus that the Board was free to allow Wackenhut to file supporting evidence even after a final decision had issued denying the objections, we would still find that under these circumstances the Board was justified in ruling Wackenhut was too late in its proffer.[9] The incidents Wackenhut seeks to raise occurred one to four months before the Board and the Regional Director issued their final orders, and the company does not argue that it lacked knowledge of the incidents before March 16 (Board's order denying reconsideration of denial of review of Direction of Election) and March 17 (Regional Director's certification of representative). The Board's rules do not require it to reopen the proceeding based on evidence that could have been, but was not, presented so long before the orders issued.
 
 
 20
 Wackenhut also argues that re-raising these three incidents in this unfair labor practice proceeding entitles the company to an evidentiary hearing in this proceeding. Again, the Board correctly rejected this argument. It is well-established that only newly-adduced evidence that was unavailable during the representation proceeding, or a special circumstance, entitles a party to a new hearing during a related unfair labor practice case. See Pittsburgh Glass Co. v. NLRB, 313 U.S. 146, 161-62, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); 29 C.F.R. § 102.67(f). Board rules prohibit relitigating an issue that "was, or could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding." 29 C.F.R. § 102.67(f). A technical refusal-to-bargain case is a "related unfair labor practice proceeding" under this rule. See Family Serv. Agency, 163 F.3d at 1381 (listing cases). Furthermore, as discussed above, these three incidents were raised in the representation proceeding (and, therefore, were not "newly adduced"), and the Board properly denied reconsideration of its final orders based on them. Wackenhut is thus barred from what amounts to a second trial based on this evidence. See Coin Devices Corp., 325 N.L.R.B. No. 75, 1998 WL 136113 (1998).[10]
 
 
 21
 Wackenhut also argues that the Board erred in refusing to consider a fourth incident that occurred on May 7. Wackenhut raised this incident for the first time in the unfair labor practice proceeding. We find that in its decision granting summary judgment to the General Counsel, J.A. at 1814, the Board correctly determined that the incident, in which Sakata allegedly helped to organize guards' pickets, is irrelevant to this refusal-to-bargain case. Wackenhut refused to bargain with the association by letter dated May 4, 1998, and conduct occurring after the company refused to bargain is simply not germane to this proceeding. See id. at n. 2 (proper procedure is to file a petition to revoke certification).
 
 III. THE AFFILIATION ISSUE
 
 22
 "Under well-established principles of deference, we must uphold the Board's determination unless it has 'acted arbitrarily or otherwise erred in applying established law to the facts at issue.' " Pittsburgh Press Co. v. NLRB, 977 F.2d 652, 654 (D.C.Cir.1992) (quoting North Bay Dev. Disabilities Servs. v. NLRB, 905 F.2d 476, 478 (D.C.Cir.1990) (citation omitted)). We affirm the legal conclusions of the Board if they are "reasonably defensible." Ford Motor Co. v. NLRB, 441 U.S. 488, 495-97, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). In reviewing the Board's findings of fact, we may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 23
 As a threshold matter, Wackenhut contends that the Board's tolerance for the aid, assistance and support of nonguard unions towards fledgling guards' unions violates the Act's "unambiguous" prohibition of "indirect affiliation" between the two kinds of unions, and its line of cases reflecting that tolerance should be overturned as violating the plain meaning of section 9(b)(3) of the Act. Wackenhut's argument for invalidating the Board's long-standing precedent under Chevron step one, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is unpersuasive.
 
 
 24
 Chevron step one requires us to set aside an agency's interpretation of a statute if the interpretation violates Congress' clear and unambiguous directive. The meaning of the term "indirect affiliation" is far from clear and unambiguous. To "affiliate" is "to join as a member," or "to connect or associate oneself: combine." Webster's Third New Int'l Dictionary 35 (1981). The terms "directly" and "indirectly" are often juxtaposed to mean (1) officially as opposed to unofficially, as in, " 'I am not affiliated directly or indirectly with the Communist Party,' " Wieman v. Updegraff, 344 U.S. 183, 185 n. 1, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (Oklahoma's loyalty oath), or (2) a first degree relationship, such as an individual's ownership of stock, as opposed to a more attenuated one, as when an individual owns stock through a corporate form. See, e.g., Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(3) (barring direct and indirect owners of stock from certain activities). An "indirect affiliation," it follows, can take a variety of guises, requiring a fact-intensive inquiry as to whether an association or two entities, while not official or formal, nonetheless is close enough so that one of the entities must be realistically viewed as connected to or dependent on the other. In short, "indirect affiliation" is hardly a self-administering concept. We proceed, therefore, under Chevron step two to determine "whether the agency's answer is based on a permissible construction of the statute," Chevron, 467 U.S. at 843, 104 S.Ct. 2778, giving "particular weight" to the Board's interpretation of an ambiguous statute that it is charged with administering. Pittsburgh Press Co., 977 F.2d at 655. In this case, we find the Board's interpretation of the phrase was reasonable. The Board has repeatedly held that a union is indirectly affiliated with another if it is "not free to formulate its own policies and decide its own course of action independently." International Harvester Co., 145 N.L.R.B. 1747, 1749, 1964 WL 16336 (1964). "[M]utual sympathy, common purpose, and assistance between such unions" is not, standing alone, sufficient to show an indirect affiliation. Id. When a guards' union is in its formative stages, and has received logistical and clerical assistance and sundry advice from other established unions, the Board has determined that the spirit of the Act--to insure that the employer maintains a faithful pool of employees to protect its business and property--is not violated. In sum the Board's interpretation of the term "indirectly affiliated," as reflected in its cases, requires a substantive bond that binds the two unions in management and policy, so that the guards' union cannot determine its own course without approval of the nonguard union; that interpretation is an entirely reasonable one.
 
 
 25
 Wackenhut argues more specifically that the Board erred in applying its "formative stage" precedent to the facts in this case. In what admittedly is a close case, we ultimately defer to the Board's conclusion that the duration and extent of Sakata's involvement with the Officers' Association did not amount to an indirect affiliation between the Carpenters and the guards. Our deference is based in part on the extremely fact-intensive nature of this inquiry and on the Board's extensive experience in examining the relative independence of guards' unions. Cf. International Harvester, 145 N.L.R.B. at 1749, 1964 WL 16336 (listing facts shown to be dispostive of affiliation issue).
 
 
 26
 The Regional Director concluded that Sakata played "an important part in the initial formation of the Union and continues to play a significant part in its current organizing activities among the Employer's armed security personnel." J.A. at 122. However, the Regional Director continued, "Sakata's assistance to the Union was provided at a time when the Union was plainly still in its 'formative stages.' The Union had come into being just about a month prior to the hearing and its officers and directors have little, if any, experience in organizing or administering a union." Id. There is always a lurking question, of course, in these cases, of how long a "formative stage" should last. Although Board precedent on this issue is a bit fuzzy, we agree that in this case at the time of the pre-election representation hearing, the Officers' Association was in its formative stage. The association convened its first meeting at the end of July, held 10 or so further organizational meetings, and obtained authorization cards and filed the necessary organizational documents with the Board. The pre-election hearing was held a scant two months after the officers first began discussing their own union, before it had begun to collect dues or attempt to bargain. See, e.g., U.S. Corrections Corp., 325 N.L.R.B. No. 54, 1998 WL 65903 (1998) (no unlawful affiliation when business agent of non-guard union assists guards' union through collective bargaining but ceases assistance in the midst of bargaining); Inspiration Consol. Copper Co., 142 N.L.R.B. 53, 1963 WL 16063 (1963) (no unlawful affiliation when non-guard union representative served as conduit between international guards' union and fledgling local; guards' international union relied on non-guard organizer and had no direct contact with guards until two days before representation hearing; nonguard representative obtained authorization cards and distributed them, and announced at organizational meeting two days before representation hearing that he could no longer represent them); Federal Servs. & Indep. Guard Ass'n of Nev., 115 N.L.R.B. 1729 (1956) (no affiliation when officers of two non-guard unions served as officers of and negotiators for guards' union in first two months' of guards' union's existence).
 
 
 27
 We hold further that it was reasonable for the Regional Director to conclude that Sakata's help did not compromise the new union's independence. See J.A. at 123 ("there is no evidence in the record which indicates or even suggests that the Union, once it passes its formative stages and attains some degree of maturity, will not act freely and independently of Sakata"). The Regional Director noted that the association had established "a number of committees, including a bargaining committee, which will make decisions for it, and none on which Sakata sits," id., and that Sakata's assistance was largely logistical and clerical in nature. See id. This sets the case apart from those previous Board cases in which guards' unions received more substantive aid and for longer periods of time--thus calling into serious doubt their ability to exercise freedom and independence in formulating their own policies and deciding their own courses of action. See Magnavox, 97 N.L.R.B. at 1113, 1952 WL 11202. For example, in Brinks, Inc., 274 N.L.R.B. 970, 1985 WL 45836 (1985), the Board refused to certify as a guards' bargaining representative a union whose "main force" and secretary-treasurer was an officer of the Teamsters' local and a member of the regional Joint Council of Teamsters. This individual drafted the guards' bylaws and authorization cards, which the Board found were identical to those of the Teamsters' local, and presided over the guards' only meeting. Similarly, in Stewart-Warner Corp., 273 N.L.R.B. 1736, 1985 WL 45992 (1985), a case on which Wackenhut heavily relies, a guards' union was denied certification where a Teamsters' local (Local 714) had begun organizing guards at a plant but, realizing it could not admit guards and non-guards to the same union, recruited a guard to continue the organizing efforts.
 
 
 28
 [ ] Petitioner's president was a longtime friend of officers and agents of Local 714 and was "sought" by Local 714 to continue organizational efforts among the Employer's guards immediately after Local 714 withdrew its own petition. Local 714 prepared the showing of interest petition circulated among the Employer's guards, including therein language which waived dues until a collective-bargaining agreement was obtained by Petitioner. In addition, Local 714 obtained employee signatures on this petition and prepared the representation petition which was filed by Petitioner with the Board.
 
 
 29
 Id. at 1737, 1985 WL 45992. Accord Bally's Park Place, Inc., 257 N.L.R.B. 777, 1981 WL 20678 (1981) (indirect affiliation where business manager of guards' union attended and participated in non-guards' union's weekly business meetings, and guards' union participated in picketing at non-guards' union site); The Wackenhut Corp., 223 N.L.R.B. 1131, 1976 WL 6921 (1976) (indirect affiliation found where same individual served as secretary-treasurer of guards' union and assistant to the president of non-guards' union, guards' union's president was employed by non-guards' union and negotiated the collective-bargaining agreement, two officers of non-guards' union had check-signing authority for guards' union, and shared office and secretarial staff continued for six years); Mack Manuf. Corp., 107 N.L.R.B. 209, 1953 WL 10904 (1953) (indirect affiliation where local CIO committeeman conducted all of the actual organizing and soliciting and witnessed guards' authorization cards, and meetings were held in CIO's building). This case is more like The Midvale Co., 114 N.L.R.B. 372, 1955 WL 12978 (1955), in which the non-guard union's involvement in the guards' union's affairs involved principally advice as to organizational strategies, a shared lawyer, a shared meeting room for one organizational meeting, mimeographed authorization cards provided by the non-guards' union, and attendance by guards at a meeting of the nonguards' union. Although Sakata participated in a half dozen meetings of the guards' union that occurred in the Carpenters' offices, that does not seem enough to us to "displace the Board's choice," Universal Camera, 340 U.S. at 488, 71 S.Ct. 456; the testimony showed that Sakata provided more advice than direction at these meetings. See J.A. at 174, 211 (testimony of Murray; Sakata).
 
 
 30
 We are cognizant that utilization of the "formative stage" doctrine should not immunize any new guards' union that receives help from a non-guards' union; rather, the facts of each case require careful attention. We caution that two of the Regional Director's conclusions, while supported by the record in this case, could be applied in another case to nudge the "formative stage" doctrine from a fact-bound analysis to a broader exemption that would cover most new guards' unions. First, the Regional Director supported his ruling on certification with observations that the union was new, inexperienced, small, and without financial or other resources, suggesting its critical need for experienced help in getting started. See J.A. at 122. However, a different reading of similar facts was adopted in Stewart-Warner, 273 N.L.R.B. at 1738, 1985 WL 45992, in which the Board noted that a new, inexperienced, small and poor guards' union could easily be overborne by an experienced non-guards' union. Second, the Regional Director here relied on the fact that the association was not created as a "proxy" for the Carpenters, and that Sakata had no "veto" authority over the association's decisions. J.A. at 123. But as the Eleventh Circuit has noted, section 9(b)(3) of the Act "prevents 'affiliation,' not merely 'control.' " NLRB v. Brinks, Inc. of Fla., 843 F.2d 448 (11th Cir.1988). Nonetheless, we agree that at the end of the day, the record supports the conclusion that the two unions in this case are not "affiliated," such that the guards' union cannot act independently and make its own policy choices. Credible testimony showed that Sakata's filling out of the LM-1 petition, obtaining of sample bylaws and constitutions, attendance at meetings and answering questions, and distribution of authorization cards were all done at the behest of the guards, who never gave him carte blanche to act on their behalf but rather asked him to provide particular advice and certain clerical services. In addition there is uncontroverted evidence showing that the union had been in existence for only two months before the hearing, that Sakata's role was primarily advisory, and that Sakata was the only non-guard providing assistance, lend substantial support to the Regional Director's conclusion of no indirect affiliation.[11] Cf. Brinks, Inc., 276 N.L.R.B. No. 1 at n.4, 1985 WL 46189 (indirect affiliation found where close affiliation between two unions, including a common officer, existed for at least 10 months before hearing).
 
 
 31
 We also conclude that the Board did not err in its rulings on the past election incidents raised by Wackenhut. In its March 16 order denying reconsideration of the Direction of Election, the Board considered evidence of three additional incidents that occurred between Sakata and the guards' association post-election: that Sakata contacted the Board about election procedures; that Sakata orally told a Wackenhut manager after the election to start bargaining with the association; and that Sakata sent Wackenhut a letter asking the company to designate a bargaining agent. The Board concluded that none of these events indicated that Sakata was directing the union, instead of vice versa, and we agree. We observe, in addition, that Sakata did not represent himself as the association's bargaining agent; his function was more akin to shepherding a new union through its post-election, adolescent pangs. Again, we decline to "displace the Board's choice between two fairly conflicting views," Universal Camera, 340 U.S. at 488, 71 S.Ct. 456, and we sustain the Board's conclusions here as reasonably defensible.
 
 
 32
 Finally, the Board reasonably found that Sakata's involvement as the union's "agent" stopped as of November 28, 1997, the date of the Officers' Association letter to Wackenhut announcing that the association's vice-president would henceforth serve as its agent. See J.A. at 305 (March 16 order denying reconsideration of decisions denying review of Direction of Election). The Board has consistently held that no indirect affiliation exists even where involvement of a nonguards' union in a guards' union affairs has been extensive but stops at the conclusion of the union's formative stage. See, e.g., International Harvester, 145 N.L.R.B. at 1749, 1964 WL 16336 ("The Board has refused to find indirect affiliation where, on the record, it appeared that the assistance and advice once received by the guard union from the nonguard union had, in fact, terminated."); Inspiration Consol. Copper Co., 142 N.L.R.B. 53, 1963 WL 16063 (1963) (no indirect affiliation when no prospect of future assistance, where union representative from smelters' union once served as liaison between local and international guards' union); Federal Servs., 115 N.L.R.B. at 1730, 1956 WL 14444 (no indirect affiliation when help from non-guards' union officers ceased after formative stage). Recently, in U.S. Corrections Corp., 325 N.L.R.B. No. 54, 1998 WL 65903 (1998), the Board found that even though the business agent for a non-guard local participated in collective bargaining on the guards' behalf and helped to conduct their organizational efforts for 8 months, there was no indirect affiliation at the time the employer filed a petition to revoke the union's certification. By then, the non-guard business agent had announced that he would no longer take part in collective bargaining, and the Board declined to revoke the certification because any prior affiliation had terminated.
 
 
 33
 A reviewing body will of course look behind a professed intention to cease assistance to a guards' union to ensure that it is bona fide. See Bally's Park Place, Inc., 257 N.L.R.B. 777, 1981 WL 20678 (1981) (considering conflicting evidence regarding whether an indirect affiliation had actually ceased). In this case, the Board considered the only timely presented piece of evidence presented by Wackenhut that pertained to Sakata's activities after the November 28 letter from the Officers' Association stating that Sakata would no longer serve as the association's agent: Sakata's attendance at an unemployment hearing with a former guard employee. The Board concluded, and we agree, that by itself this incident does not amount to enough to show that Sakata was still acting as an agent for the association. See J.A. at 532 (May 6, 1998, order denying review of Regional Director's certification decision).[12]
 
 IV. CONCLUSION
 
 34
 For the reasons stated above, we grant the Board's cross-petition for enforcement and deny Wackenhut's petition for review and for an evidentiary hearing.
 
 
 35
 So ordered.
 
 
 
 [1]
 Although the Regional Director estimated that there were approximately 14 guards eligible for membership in this union, see Joint Appendix ("J.A.") at 124 n.10, the Tally of Ballots indicates that there were 11 eligible voters at the time of the election, see id. at 277
 
 
 [2]
 The Board noted, however, that in the representation election which the Board ordered in its opinion, the ballots would bear only the guard union's name. Id. at 376
 
 
 [3]
 Wackenhut does not challenge the testimony of Murray and Sakata
 
 
 [4]
 Sakata testified that he received mail at the Carpenters' office for the Officers' Association, but that he does not open it and read it. See J.A. at 231. He also received service of a subpoena duces tecum for documents pertaining to the association in conjunction with the Board proceedings in this case. See id. at 232
 
 
 [5]
 The record contains no elaboration as to whether Sakata handed out union cards individually to guards or whether he provided them to the association at a meeting
 
 
 [6]
 It does not appear that these letters are part of the record, but their existence is not disputed
 
 
 [7]
 Our perusal of the record does not lead us to conclude that Sakata helped to write the association's constitution and bylaws, and it does not appear that this is the intended meaning of the fifth finding that Sakata "assisted" the association in drafting the documents. Rather, it is clear, as outlined above, that Sakata's involvement was limited to obtaining copies of other such documents for the association to use. The Board in its brief confirms that this is the correct interpretation of this finding. See Brief for Cross-Petitioner ("Board's Br.") at 14
 In addition, we do not take finding 6 to mean that the record showed Sakata would actually negotiate a future collective bargaining agreement. We believe the Regional Director meant, and the record reflects, that Sakata was to be available for advice during the bargaining period. Indeed, later in his decision, the Regional Director observed that the association established "a number of committees, including a bargaining committee, which will make decisions for it, and none on which Sakata sits," J.A. at 123, indicating that the Regional Director believed Sakata's role in collective bargaining would be merely advisory.
 
 
 [8]
 This letter does not appear in the record, but Wackenhut does not challenge its existence
 
 
 [9]
 Wackenhut also argues, Petitioner's Brief ("Pet. Br.") at 38, that the new evidence was not submitted in support of its post-election objections, but was actually submitted in support of its Request for Review of the Regional Director's Supplemental Decision and Certification. This argument is ill-conceived, given that the supplemental certification order was, in fact, the ruling on Wackenhut's objections
 
 
 [10]
 Insofar as Brinks, Inc. of Fla. v. NLRB, 276 N.L.R.B. 1, 1985 WL 46189 (1985), appears to hold that the mere re-raising of an issue in a technical refusal-to-bargain proceeding in which the employer claims that the union has violated section 9(b)(3) of the LMRA is a "special circumstance" sufficient to warrant a new hearing, it appears to be inconsistent with mainstream Board precedent. See, e.g., id. at 2, 1985 WL 46189 (Member Hunter, concurring in the judgment); Coin Devices Corp., 325 N.L.R.B. No. 75 at nn.1 & 2, 1998 WL 136113; Dunbar Armored, Inc. v. International Union, 326 N.L.R.B. No. 139, 1998 WL 700003 (1998); Santa Clara Co. Pub. Safety Officers' Ass'n, 325 N.L.R.B. No. 201, 1998 WL 398268 (1998)
 
 
 [11]
 Wackenhut argues that strong evidence in its favor lies in a claim made by the Officers' Association lawyer during the representation hearing that Sakata's communications with the lawyer were protected by attorney-client privilege. See J.A. at 236-37. We do not find this claim of privilege to be dispositive of Sakata's relationship with the union for purposes of this case. The determination of who can claim attorney-client privilege on behalf of an organization and in what situations is a highly fact-specific inquiry, and it is natural that the union would seek to invoke it for any advisor or agent who communicated with its lawyer about union business
 
 
 [12]
 We observe that the Officers' Association April 7, 1998, bargaining demand to Wackenhut was neither authored by nor "cc'd" to Sakata. See J.A. at 1167-68